## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HARRIET MYERS, derivatively on behalf of DEVRY EDUCATION GROUP INC., | : Civil Action No. |
| Plaintiff, | : |
| v. | : |
| DANIEL HAMBURGER, TIMOTHY J. WIGGINS, RICHARD M. GUNST, PATRICK K. UNZICKER, CHRISTOPHER B. BEGLEY, DAVID S. BROWN, LISA WARDELL, ANN WEAVER HART, LYLE LOGAN, ALAN G. MERTEN, FERNANDO RUIZ, RONALD L. TAYLOR, and JAMES D. WHITE, | : **JURY TRIAL DEMANDED** |
| Defendants, | : |
| and | : |
| DEVRY EDUCATION GROUP INC., | : |
| Nominal Defendant. | |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.    Plaintiff Harriet Myers ("Plaintiff"), by and through her undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant DeVry Education Group, Inc. ("DeVry" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from at least 2011 through the present (the "Relevant Period").[1]

---

[1] While Plaintiff and her counsel have conducted their own, independent investigation, many of the facts and allegations contained herein including the confidential witness accounts appear in the Second Amended Class Action Complaint for Violations of the

## NATURE OF THE ACTION

2.      According to its public filings, the purpose of DeVry is to empower its students to achieve their educational and career goals.   DeVry provides educational services worldwide through a number of subsidiaries, including DeVry University ("DVU" or "DeVry University"), which the defendants have described as one of the largest degree-granting higher education systems in the United States.  Through its five colleges, DeVry University offers programs in healthcare, business, technology, accounting, finance and law.

3.      For years, the defendants have boasted about the employment prospects of DeVry University graduates (to shareholders, students, and the public), emphasizing that 90% of DVU graduates obtained employment in their field of study within six months of graduation and that DVU graduates' salaries one year after graduation were 15% higher than the average or median salaries of graduates with bachelor's degrees from all other colleges and universities.

4.      However, on January 27, 2016, the U.S. Federal Trade Commission (the "FTC") filed suit against DeVry and DeVry University, accusing them of deceptively advertising the benefits of obtaining a bachelor's degree at DeVry University (the "FTC Action").

5.      Specifically, the FTC Action charged that defendants' claim that 90% of DeVry University graduates actively seeking employment landed jobs in their field of study within six months of graduating was deceptive.  Similarly, it charged that DeVry

---

Federal Securities Laws (the "Securities Complaint") filed against the Company and certain of its officers related to many of the same allegations contained herein.  *See Pension Trust Fund For Operating Engineers v. DeVry Education Group, Inc., et al.*, No. 16-cv-05198 (N.D.I.L., filed December 23, 2016) (the "Securities Action").

University's claim that, since 1975, 90% of its graduates seeking employment in their fields of study obtained employment within six months of graduation is false and misleading. Lastly, the FTC Action also asserted that another key claim made by the defendants about DeVry – that DeVry's graduates had 15 percent higher incomes one year after graduation on average than the graduates of all other colleges or universities – was also deceptive.

6.     The FTC noted that DeVry's claims frequently appeared in advertisements on television, radio, online, print and other media, and were a central part of many public filings and letters sent to DeVry shareholders. According to the FTC, the 90% claim was central to DeVry's marketing efforts (during the Relevant Period), and the income superiority claim began in 2013. For example, one ad that ran on national television and YouTube featured individuals in business attire hanging hundreds of "offer letters" on a wall, with a voiceover discussing the importance of getting a job offer to college students.

7.     Moreover, the FTC accused DeVry of deceptively counting numerous graduates as working "in their field," including these examples from the 2012 graduating class: (1) a graduate who majored in business administration with a specialization in health services management working as a server at a restaurant; (2) multiple graduates with majors in technical management whose employment was listed as unpaid volunteer positions at medical centers; a graduate who majored in technical management with a human resources specialization working as a rural mail carrier and another who worked as a driver delivering rain gutters for a construction company; and (3) a graduate who majored in business administration with a health care management specialization working as a car salesman. This occurred under the defendants' direction and on their watch.

8.     The FTC Action also contended that DeVry's calculations included graduates who were working in jobs they held prior to enrolling at DeVry, as opposed to those they obtained after graduating.  In addition to counting these and other graduates as working "in their field," the FTC Action also highlighted that the Company excluded graduates from DeVry's count of those "seeking employment" as inactive when they were in fact actively seeking employment.[2]

9.     Also on January 27, 2016, the U.S. Department of Education (the "Department of Education" or "DOE" or "DoE") issued DeVry University a Notice of Intent to Limit DeVry University's participation in programs authorized pursuant to Title IV of the Higher Education Act of 1965 as amended ("HEA"), 20 U.S.C. § 1070 *et seq.*, after finding that DeVry was in violation of federal law (the "DoE Action").

10.    According to the DOE, during the Relevant Period and continuing until at least August 2015, DeVry's marketing and promotional materials represented that, "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation" (the "Since 1975 Representation").  On August 28, 2015, the DOE, concerned with the veracity of DeVry's Since 1975 Representation, sent a letter to DeVry University requesting it to substantiate the truthfulness of those representations.  After several requests for information, the DOE concluded that "DeVry is unable to substantiate the truthfulness of those representations, as required by federal law."  As a result of DeVry's violation of federal law (which occurred under the defendants' direction and on their watch), the

---

[2] On May 9, 2016, Judge Michael W. Fitzgerald of the Central District of California rejected DeVry's request to dismiss the FTC's Action against the Company, finding, among other things, that the "allegations show that the FTC's claims have factual basis and provide Defendants with adequate notice as to the FTC's reason for believing that the employment statistic is unsubstantiated and materially false."

Department of Education imposed numerous conditions on DeVry in order for it to continue to receive Title IV funds.

11.     In reaction to these troubling disclosures, DeVry's common stock price dropped 15%, or $3.65 per share, from $23.68 per share on January 26, 2016 to $20.09 per share closing on January 27, 2016.

12.     Over the next several trading days, DeVry's stock price continued to trade lower, closing at $18.08 per share on February 2, 2016. In total, from January 27, 2016 to February 2, 2016, DeVry's stock price share price dropped $5.66 per share, or 24%.

13.     On October 13, 2016, the DoE announced that it had entered into a settlement (the "DoE Settlement") "resolving the Department's charge that [DeVry] used unsubstantiated job placement claims in recruitment and advertising materials." In the DoE's press release issued that day, the DoE explained that the settlement "enhances the Department's oversight of DeVry and builds upon the Obama Administration's commitment to protecting students, safeguarding taxpayer dollars and increasing accountability among postsecondary institutions."

14.     On December 15, 2016, the FTC and the defendants announced that DeVry had agreed to a $100 million settlement (among other remedial penalties) to resolve the FTC's claims (the "FTC Settlement"). FTC Chairwoman Edith Ramirez accurately summed up the settlement, emphasizing that "[w]hen people are making important decisions about their education and their future, they should not be misled by deceptive employment and earnings claims. . . . The FTC has secured compensation for the many students who were harmed, and I am pleased that DeVry is changing its practices." According to the FTC press release, "DeVry will pay $49.4 million in cash to

be distributed to qualifying students who were harmed by deceptive ads, as well as $50.6 million in debt relief." But DeVry's settlement with the FTC goes beyond financial redress and tackles the same types of deceptive job placement and salary statistics described herein. According to the FTC, the settlement "includes provisions designed to prevent DeVry from misleading consumers in the future," and, among other things, "prohibits DeVry from misrepresenting the likelihood that graduates will get a job as a result of their degree," and "specifically prohibits DeVry from including jobs students obtained more than six months before graduating whenever DeVry advertises its graduates' success in finding jobs near graduation." The FTC further provided that the settlement precludes DeVry from "misrepresenting the compensation or compensation ranges that students or graduates have received or can be expected to receive."

15. As further detailed herein, at relevant times, the defendants made false and/or misleading statements and/or failed to disclose that under their direction and on their watch: (i) 90% of DeVry University students from a specific year (*e.g.*, graduates from 2011-2016) who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; (ii) 90% of DeVry University students since 1975 who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; (iii) one year after graduation, the average or median salary of DeVry University graduates with bachelor's degrees was not in fact 15% higher than the average or median salary of graduates with bachelor's degrees from all other colleges and universities; (iv) defendants overstated the Company's growth, revenue, and earnings potential by concealing the true employment prospects of DeVry University graduates to investors and potential students;

and (v) the defendants' statements about DeVry's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

16.     Accordingly, as a result of the defendants' actions, the Company has suffered damages, including (but not limited to) being the subject of the FTC Action (and FTC Settlement), the DoE Action (and DoE Settlement), the Securities Action, suffering a severe loss of reputation and standing, and witnessing the decimation of its share price.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

18.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. The Company is headquartered in this District, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

19.     Plaintiff is a current shareholder of DeVry and has continuously held DeVry stock since at least 2010.

20.     Nominal defendant DeVry is a Delaware corporation with its principal executive offices located at 3005 Highland Parkway, Downers Grove, Illinois 60515.

21.     Defendant Daniel Hamburger ("Hamburger") served as the Company's President and Chief Executive Officer ("CEO") from 2002 until on or about May 24, 2016, when he "left" DeVry purportedly to pursue other opportunities.

22.     Defendant Timothy J. Wiggins ("Wiggins") served as the Company's Chief Financial Officer ("CFO") from January 3, 2012 until on or about June 30, 2016.

23.     Defendant Richard M. Gunst ("Gunst") served as the Company's CFO from 2006 until January 3, 2012.

24.     Defendant Patrick J. Unzicker ("Unzicker") served as DeVry's Vice President, Finance and Chief Accounting Officer from March 1, 2012 to May 31, 2016. In March 2015, Unzicker assumed the role of Treasurer, and since May 31, 2016 has also served as the Company's Senior Vice President and CFO.

25.     Defendant Christopher B. Begley ("Begley") has served as a director of the Company since November 2011 and Chairman of the Board since November 2014.

26.     Defendant David S. Brown ("Brown") served as a director of the Company from November 1987 until November 2016.  In addition, defendant Brown served as a member of the Board's Audit and Finance Committee (the "Audit Committee") and the Board's Academic Quality Committee (the "Quality Committee") at relevant times.

27.     Defendant Lisa Wardell ("Wardell") has served as the Company's CEO since on or about May 24, 2016, and has served as a director of the Company since 2008. In addition, defendant Wardell served as Chair of the Audit Committee and a member of the Quality Committee at relevant times.

28.     Defendant Ann Weaver Hart ("Hart") has served as a director of the

Company since March 2016.

29.     Defendant Lyle Logan ("Logan") has served as a director of the Company since November 2007.  In addition, defendant Logan served as a member of the Audit Committee at relevant times.

30.     Defendant Alan G. Merten ("Merten") served as a director of the Company from November 2012 until November 2016.  In addition, defendant Merten served as a member of the Quality Committee at relevant times.

31.     Defendant Fernando Ruiz ("Ruiz") has served as a director of the Company since November 2005.  In addition, defendant Ruiz served as a member of the Audit Committee at relevant times.

32.     Defendant Ronald L. Taylor ("Taylor") has served as a director of the Company since November 1987.  Taylor served as the Company's CEO from July 2004 until November 2006.  Taylor has served as a Senior Advisor to DeVry since November 2006. From August 1987 until his November 2002 appointment as Co-CEO, Taylor was the Company's President and Chief Operating Officer ("COO").   In addition, defendant Taylor served as Chair of the Quality Committee at relevant times.

33.     Defendant James D. White ("White") has served as a director of the Company since June 2015.  In addition, defendant White served as a member of the Audit Committee and Quality Committee at relevant times.

34.     Collectively, defendants Hamburger, Wiggins, Gunst, Unzicker Begley, Brown, Hart, Logan, Merten, Ruiz, Taylor, Wardell, and White shall be referred to herein as "Defendants."

35.     Collectively, defendants Brown, Logan, Ruiz, Wardell and White shall be

referred to as the "Audit Committee Defendants."

36.     Collectively, defendants Brown, Merten, Taylor, Wardell and White shall be referred to as the "Quality Committee Defendants."

### DEFENDANTS' DUTIES

37.     By reason of their positions as officers, directors, and/or fiduciaries of DeVry and because of their ability to control the business and corporate affairs of DeVry and its subsidiaries (including but not limited to DVU), Defendants owed DeVry and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage DeVry and its subsidiaries (including but not limited to DVU) in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of DeVry and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to DeVry and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and its subsidiaries and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38.     Defendants, because of their positions of control and authority as directors and/or officers of DeVry, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with DeVry, each of the Defendants had knowledge of material non-public information regarding the Company.

39.     To discharge their duties, the officers and directors of DeVry were required to exercise reasonable and prudent supervision over the management, policies,

practices and controls of the Company. By virtue of such duties, the officers and directors of DeVry were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

40. The Company's Governance Principles applies to each of the Defendants. Pursuant to the Company's Governance Principles:

Director Responsibilities. The basic responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be the best interests of DeVry Group and its shareholders. The Board has four scheduled meetings a year at which it reviews and discusses reports by management on the performance of DeVry Group, its plans and prospects, as well as immediate issues facing DeVry Group. Directors are expected to attend Board meetings and meetings of the committees on which they serve, and to spend the time needed to properly discharge their responsibilities. In addition to its general oversight of management and of the conduct of DeVry Group's business, the Board performs a number of specific functions, including:

a. selecting, evaluating and compensating the CEO and overseeing management succession planning;

b. providing counsel and oversight on the selection, evaluation,

development and compensation of senior management;

c. reviewing, approving and monitoring financial and business strategies and major actions of the organization;

d. assessing major risks facing DeVry Group and reviewing options for their mitigation and/or elimination;

e. ensuring that processes are in place for maintaining the integrity of DeVry Group, the accuracy of the financial statements, compliance with law and ethics, including compliance with DeVry Group's Code of Business Conduct and Ethics, and the integrity of relationships with customers, suppliers and other stakeholders.

The Board has delegated to the CEO the authority to manage the business consistent with applicable policies and any specific Board directives.

*       *       *

Board Access to DeVry Group Management. Directors have full access to DeVry Group's management. At the invitation of the Board, members of senior management recommended by the CEO attend Board meetings, or portions thereof, to participate in discussions and make presentations.

41.     The Company's Code of Conduct and Ethics (the "Code") applies to each of the Defendants.  The Code sets forth, in relevant part:

**Accurate books and records**
*Ensure that our books and records are truthful, accurate, and complete*

The DeVry Education Group works hard to deliver quality education to our students and to achieve superior financial results. We always strive to provide our shareholders and other stakeholders with full, accurate, timely, and understandable financial information related to our organization's performance. For this reason, it is paramount for each institution to produce honest, accurate, and timely financial reports and records.

As a publicly held organization, we are required to report financial information in accordance With generally accepted accounting principles in the U.S., and to maintain books and records that accurately and fairly reflect all transactions. This obligation, however, includes more than just financial information. Each of us must ensure that the organizational information we create and handle is truthful, accurate, and complete. This includes accurately recording enrollments, attendance, grades, communications, tuition, revenues, costs, shipments, time sheets,

vouchers, payroll and benefits records, expense accounts, test data, regulatory data, and other essential organizational information.

As a colleague of DeVry, you must:

- Fully comply with all laws, external accounting requirements, and DeVry Group policies and procedures for reporting financial and other organizational information.
- Never deliberately make a false or misleading entry in a report or record.
- Never establish an unrecorded fund for any purpose.
- Never sign for or represent yourself as another student, parent, or colleague.
- Never alter or destroy DeVry Group records except as authorized by established policies and procedures.
- Never sell, transfer, or dispose of DeVry Group assets without proper documentation and authorization.
- Cooperate with DeVry' Groups internal and external auditors.

You are expected to act with honesty and integrity in the performance of your duties. Fraudulent activity of any kind will not be tolerated.

\*       \*       \*

Various laws apply to the manner in which we earn, maintain, and disclose our accreditation and authorization to operate; record and publish examination pass rates; determine and share our graduates' employment rates; and calculate, report, and disclose student financing information. The accuracy and integrity of this information is a vital part of our operations and a key ingredient to maintaining our strong reputation for being a leading provider of educational services.

Always exercise great care when recording such information, and only share or disclose such information if authorized to do so.

\*       \*       \*

**Material information**
*Disclose material or financial information only when authorized*

As a publicly held organization, DeVry Education Group are subject to many laws, regulations, and rules that dictate the manner by which we disclose confidential, sensitive, and "material, non-public information."

Therefore, we must carefully manage the disclosure of material or financial information to anyone outside of the organization.

Generally, material, non-public information refers to information not available to the public and that a reasonable investor would consider important in making investment decisions. There are many examples of material, non-public information, such as:

- Enrollment data
- Internal projections, targets, and budgets
- Undisclosed financial results
- Potential mergers, acquisitions, and joint ventures
- Growth or expansion plans
- Career statistics
- Organizational restructuring, particularly at the executive level
- Strategic plans
- New academic programs
- Marketing, recruiting, and advertising strategies
- Inquiry flow, conversion rates, and retention rates
- Information related to the utilization of financial aid

It is important to know that material, non-public information can also be confidential information about another organization that you have obtained during the course of your work. You are not permitted to "selectively" disclose material, non-public information to any individual or group of individuals before DeVry Group releases the information to the public, unless it is covered by a confidentiality agreement approved by DeVry Group Legal. The laws covering disclosure are strict, and the fines and penalties are steep.

*       *       *

**Advertising and marketing**
*Advertise and market responsibly*

Our advertising and marketing activities are a critical part of our operations. They help us to attract students and customers who will succeed in our academic programs and help us achieve our organizational goals. The laws that govern our advertising and marketing activities are strict, so it is critically important that you are familiar with the guidelines that relate to these activities.

When developing or implementing marketing and advertising materials, you must:

**Always**

14

- Comply with all applicable legal requirements.
- Be truthful, complete, accurate, and not misleading.
- Clearly state that the education offered is not a guarantee of employment or "success."
  Indicate "for those who qualify" when referring to financial assistance.
- Provide supporting data and qualifying language when using certain statistics.

**Never**
- Include false or misleading statements about the institution or its services.
- Claim one of our educational institutions is superior to another educational institution, as that cannot be measured.

42.     Pursuant to the terms of the Quality Committee's Charter, the Quality Committee Defendants were charged with the following (in pertinent part):

**Duties and Responsibilities**

1.     Review each of the academic policies of DeVry Group Institutions, including the evaluation of the academic quality and assessment process, the evaluation of curriculum and programs, and offer recommendations for improvement.

2.     Provide oversight of risks and exposures related to academic quality, including accreditation, curriculum development and delivery, student persistence and outcomes.

3.     At least bi-annually conduct an evaluation of its own performance and, in light of this, consider changes to its membership, charter or procedures. The Committee shall report to the Board the results of its evaluation, including any recommended charter or other changes.

4.     The Committee shall meet in person at least twice a year at such times and places determined by the Chair of the Committee, with further meetings to occur, or actions to be taken by unanimous consent, when deemed necessary or desirable by the Committee or its Chair.

43.     The External Relations Committee Charter was approved on November 2, 2015. According to the charter of that committee:

**Purpose**

The purpose of the External Relations Committee (the "Committee") of the Board of Directors (the "Board") of DeVry Education Group Inc. ("DeVry Group") is to provide awareness and oversight of DeVry Group's external relations strategy, policy and practice. Specifically, the Committee will assist the management team and the Board in:

1.     Monitoring, analyzing and effectively managing legislative and regulatory policy trends, issues and risks;

2.     Developing recommendations to the Board with regard to formulating and adopting policies, programs and communications strategy related to legislative, regulatory and reputational risk; and

3.     Overseeing risks and exposures related to higher education public policy, as well as compliance with laws, regulations applicable to DeVry Group.

The Committee shall annually conduct an evaluation of its own performance and, in light of this, consider changes to its membership, charter or procedures.

The Committee shall report to the Board the results of its evaluation, including recommended charter, membership and other changes.

The Committee shall meet in person or telephonically at least twice a year, with further meetings to occur, or actions to be taken by unanimous written consent, when deemed necessary or desirable by the Committee or its Chair.

At the DeVry Group Board meeting following each Committee meeting, the Committee Chair (or the Chair's designee) shall report to the full Board on the Committee's actions.

Except as expressly provided in the Charter, the By-laws, or DeVry Group's corporate governance guidelines, or as required by law, regulation or New York Stock Exchange listing standards, the Committee shall establish its own rules of procedure.

**Composition and Qualifications**

The Committee shall be composed of three or more Directors, the exact number to be determined from time-to-time by the Board, and with staff support provided by the Senior Vice President of External Relations and Regulatory Affairs.

The Chair and members of the Committee shall be designated annually by a majority vote of the Board at the organizational meeting of the Board of Directors held in connection with the annual meeting of shareholders.

Action to fill vacancies on the Committee and to remove a member of the Committee shall be taken by a majority vote of the Board.

44.     Pursuant to the terms of the Audit Committee Charter, the Audit Committee Defendants were responsible for oversight of regulatory matters and the Company's financial filings with the SEC.  The Audit Committee Charter sets forth, in relevant part:

While the fundamental responsibility for DeVry Group's financial statements and disclosures rests with management, as reviewed by the outside auditors, the Committee should require management, internal auditors and outside auditors to inform them of, and should review:

- major issues regarding accounting principles and financial statement presentations, including any significant changes in the selection or application of accounting principles, and major issues as to the adequacy of internal controls and any special audit steps adopted in light of significant deficiencies and material weaknesses;

- analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

- the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements;

- the effect of insider transactions on the financial statements under Section 401 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley");

- earnings press releases and other reports or written or electronic material (including website posted material) disclosing "pro forma," or "adjusted" non- GAAP, information;

- communications received from and DeVry Group responses to governmental officials and generally reliable published reports,

including such communications and responses concerning significant litigation, contingencies and claims against DeVry Group, that raise material issues regarding the financial statements or accounting matters; and

- other matters that are quantitatively or qualitatively material to the financial statements; and the risks and exposures relating to the quality of DeVry Group's accounting and disclosure practices and the adequacy and effectiveness of its accounting, information technology and financial controls, including DeVry Group's enterprise wide risk management, its policies and procedures to assess, monitor and manage exposure to risk and the steps management has taken with respect thereto, and DeVry Group's adherence to legal and regulatory requirements and the Code and other compliance programs.

*      *      *

**Compliance**
Establish procedures for receipt, retention and handling of confidential and anonymous submission by employees or others relating to controls, accounting or auditing matters and any other matters as might materially affect DeVry Group.

- Discuss with management, the head of the internal audit department (or other persons responsible for the internal audit function) and the outside auditors DeVry Group's adherence to legal, regulatory and ethics compliance programs, including its Code, and the steps management has taken to require and monitor such adherence by DeVry Group employees and agents.

- Review and discuss with the Vice President, Audit, Ethics and Compliance Services, Chief Financial Officer, Chief Information Officer, General Counsel and other persons responsible for monitoring compliance with the Code DeVry Group's annual reports on the Code, including investigations, if any, and corrective measures taken in response to Reports received by DeVry Group. Review and discuss with such persons, at least annually, the procedures for reviewing, granting and, to the extent required by law, regulation or NYSE rules, promptly disclosing any waivers of the Code for directors and executive officers.

- Review with DeVry Group's General Counsel legal matters that may have a material impact, either qualitatively or quantitatively, on DeVry Group's financial statements, DeVry Group's

compliance policies and any material reports or inquiries received from regulators or governmental agencies.

- Report to the Board at least annually on the performance of the Vice President, Audit Ethics and Compliance Services.

- Review and discuss the status of compliance with accounting, legal, regulatory, tax and other developments of major significance to DeVry Group.

- Obtain assurances from the outside auditor that Section 10A of the Securities Exchange Act of 1934 has not been implicated.

- Ensure that the Code is distributed annually to all DeVry Group employees, Directors and others covered by its contents.

## SUBSTANTIVE ALLEGATIONS

### A.  <u>Background of the Company and its Business</u>

45.     DeVry, founded in 1973, provides educational services worldwide through three segments: Business, Technology and Management; Medical and Healthcare; and International and Professional Education.  The Business, Technology and Management segment comprises the operation of DeVry University; the Medical and Healthcare segment includes the operations of DeVry Medical International, Chamberlain College of Nursing and Carrington College; and the International and Professional Education segment includes DeVry Brasil and Becker Professional Education.

46.     DeVry University is a subsidiary of DeVry and is described by Defendants as one of the largest degree-granting higher education systems in North America.  DeVry University was founded in 1931 and offers onsite and online undergraduate and graduate degree programs covering 34 different career fields within its five colleges of study: The College of Business & Management, which includes Keller Graduate School of Management; The College of Engineering & Information Sciences; The College of

Health Sciences; The College of Liberal Arts & Sciences; and The College of Media Arts & Technology.

### B.    Defendants' Relevant Period False and Misleading Statements

47.     Throughout the Relevant Period, Defendants advertised that 90% of DeVry University graduates actively seeking employment had careers in their fields of study within six months of graduation.   Similarly, Defendants also represented that DeVry University graduates obtained jobs with significantly higher incomes than graduates of other colleges or universities.   This statistic was a vital component of the Company's core operations, and Defendants repeated this statistic over and over, year after year, until 2015 or later.

48.     On February 4, 2011, Defendants caused the Company to file its Form 10-Q with the SEC for 2Q 2011, reiterating DeVry's previously reported financial results, including:

> Total consolidated revenues for the second quarter of fiscal year 2011 of $551.5 million increased $78.5 million, or 16.6%, as compared to the year-ago quarter. For the first six months of fiscal year 2011, total consolidated revenues increased 18.7% to $1,072.9 million as compared to the year-ago period. For both the second quarter and first six months of fiscal year 2011, revenues increased within all four of DeVry's business segments as a result of growth in total student enrollments, improved student retention and tuition price increases.

49.     With regard to undergraduate student enrollment, the 2Q 2011 Form 10-Q emphasized that "[m]anagement believes the increased undergraduate total student enrollments were most significantly impacted by DeVry's strong track record of high-quality education, academic and graduate employment outcomes, and improved retention of existing students."   Defendants made this same claim in the Company's 3Q 2011 Form 10-Q, which was filed with the SEC on May 5, 2011.

50.    In addition, the 2Q 2011 Form 10-Q contained certifications signed by defendants Hamburger and Gunst pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which stated:

I, [Daniel Hamburger/Richard M. Gunst], certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of DeVry Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a – 15(e) and 15d – 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a – 15(f) and 15d – 15(f)) for the registrant and have:

       (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

       (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

       (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report and based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

*     *     *

The following statement is provided by the undersigned to accompany the Quarterly Report on Form 10-Q for the quarter ended December 31, 2010 pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. 1350) and shall not be deemed filed or deemed incorporated by reference into any filing pursuant to any provision of the Securities Exchange Act of 1934 or any other securities law.

Each of the undersigned certifies that the foregoing Quarterly Report on Form 10-Q fully complies with the requirements of Section 13(a) or 15 (d) of the Securities Exchange Act of 1934; and that the information contained in this Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of DeVry Inc. for the periods reflected therein.

51.     Defendants Hamburger, Gunst, and/or Wiggins made substantially similar false statements in DeVry's regulatory filings since that time, including in Forms 10-Q for the periods 3Q 2011, 1Q 2012, 2Q 2012, 3Q 2012, 1Q 2013, 2Q 2013, 3Q 2013, 1Q 2014, 2Q 2014, 3Q 2014, 1Q 2015, 2Q 2015, 3Q 2015, and 1Q 2016, and Forms 10-K for year-end 2011, 2012, 2013, 2014, and 2015.

52.     On April 27, 2011, Defendants released DeVry University's 2009-2010 Academic Annual Report, asserting:

**Graduate Employment Rates**

Since 1975, more than 250,000 students systemwide have graduated from DeVry University. We have long held ourselves accountable and are proud to publish our performance on graduate employment goals.

Even in this year's tough job market, 88.3 percent of graduates (in the active job market) found jobs or were already employed in their education-related fields within six months of graduation.

The following table summarizes our 2009 Career Services results by currently offered degree program.

**2009 Career Services Results — by Degree Program**
Combined statistics for students who graduated from the February 2009, June 2009 and October 2009 classes

| | Graduates who actively pursued and obtained employment and those who were already employed in education-related careers within 180 days of graduation | Average reported annual compensation | Graduates | Graduates eligible for career assistance | Graduates who actively pursued employment for up to 180 days and these who were already employed | Graduates employed in education-related positions within 180 days of graduation | Graduates employed outside their field of study |
|---|---|---|---|---|---|---|---|
| Accounting | 93% | $35,000 | 34 | 22 | 15 | 14 | 6 |
| Biomedical Engineering Technology | 84% | $41,672 | 75 | 64 | 55 | 46 | 9 |
| Business Administration | 91% | $38,549 | 1,523 | 1,265 | 1,145 | 1,045 | 48 |
| Computer Engineering Technology | 76% | $38,858 | 129 | 110 | 94 | 71 | 5 |
| Computer Information Systems | 79% | $45,235 | 668 | 560 | 457 | 360 | 76 |
| Electroneurodiagnostic Technology | 100% | $39,115 | 2 | 2 | 2 | 2 | 0 |
| Electronics & Computer Technology | 84% | $30,746 | 351 | 253 | 190 | 159 | 55 |
| Electronics Engineering Technology | 77% | $40,808 | 300 | 264 | 229 | 177 | 25 |
| Game & Simulation Programming | 59% | $39,686 | 275 | 242 | 154 | 91 | 55 |
| Health Information Technology | 83% | $35,450 | 333 | 253 | 198 | 164 | 48 |
| Network & Communications Management | 88% | $41,966 | 579 | 508 | 442 | 391 | 49 |
| Network Systems Administration | 88% | $41,782 | 476 | 273 | 197 | 173 | 65 |
| Technical Management | 93% | $67,560 | 3,213 | 2,768 | 2,562 | 2,363 | 129 |
| Web Graphic Design | 62% | $41,928 | 59 | 35 | 21 | 13 | 10 |
| Total | 88% | $43,074 | 8,017 | 6,619 | 5,741 | 5,069 | 580 |

53.     On August 26, 2011, Defendants caused DeVry to release its 2011 Annual Report (the "2011 AR") indicating that 89% of DeVry University's recent graduates had obtained jobs in their fields of study.

54.     In this regard, Defendants caused the Company to state:

Our goal is simple: we want to give our students the education, services, and support they need to succeed, both while they are our students and after they graduate.

*We measure DeVry University's achievement towards that goal with our "90/40" standard: within six months of graduation, we want 90 percent of our graduates employed in their fields of study at an average salary of $40,000 or more. Even in this year's challenging job market, 89 percent of our graduates had jobs in their fields with an average salary of more than $43,000."*

55.     The 2011 AR's Letter to Shareholders was signed by defendant Hamburger and was attached to the Company's Form 10-K filed with the SEC on August 26, 2011, which was signed by defendants Hamburger, Gunst, Taylor, Brown, Logan, and Ruiz.

56.     The 2011 AR emphasized both the Company's strong financial performance and the success of its programs resulting in 89% of DeVry University's recent graduates obtaining jobs in their fields of study.  Defendants reported an increase of 14% in revenues ($2,182,371,000 in 2011 compared to $1,915,181,000 in 2010), an 18% increase in net income ($330,403,000 in 2011 compared to $279,909,000 in 2010) and an increase of 20.9% in earnings per common share ($4.68 in 2011 compared to $3.87 in 2010).

57.     In his Fellow Shareholders, Students, Coworkers, and Friends Letter, defendant Hamburger specifically tied the Company's financial success with its students and career success:

> Achieving that vision [of preparing students for careers that would improve the quality of life for themselves] requires strong financial results – and in 2011, DeVry delivered. In fiscal 2011, our revenues totaled $2.2 billion, a 14 percent increase over 2010, and net income grew by 18 percent to $330 million. These results enabled us to make significant investments to support the execution of our "Achieve-Grown-Build" strategy.

> We are committed to investing in the services, programs, and infrastructure that enable us to provide excellent service to our 119,000 students. We know that these investments are the key to our students. We know that these investments are the key to our students' academic and career success. We also know that their success builds our schools' reputation and drives DeVry's growth.

58.     The 2011 AR boasted the success of the Company's graduates with the

success of its "90/40" standard:

> Our goal is simple: we want to give our students the education, services, and support they need to succeed, both while they are our students and after they graduate.
>
> We measure DeVry University's achievement towards that goal with our "90/40" standard: within six months of graduation, we want 90 percent of our graduates employed in their fields of study at an average salary of $40,000 or more. Even in this year's challenging job market, 89 percent of our graduates had jobs in their fields with an average salary of more than $43,000.

59.     In the Company's 2011 Form 10-K filed with the SEC on August 26, 2011

(the "2011 10-K"), Defendants discussed the Company's enrollment trends for both its

DeVry University undergraduate and graduate programs:

> New student undergraduate enrollment in summer 2011 decreased 25.6% to 15,566 students as compared to the prior year. Total undergraduate enrollment in summer 2011 was 64,317 students, a decrease of 5.8% compared to 68,290 in the previous summer.
>
> There were 21,576 coursetakers for the July 2011 session in DeVry University's graduate programs, including its Keller Graduate School of Management, representing an increase of 1.9% over the prior year. Coursetaker enrollment in DeVry University online program offerings in summer 2011 was 69,617, a decrease of 0.7% over the prior year.

60.     As the 2011 10-K noted, a "strong motivation for students considering a

postsecondary education is the prospective income premium."   At the same time,

Defendants noted the competitive nature of the postsecondary education market which is

"highly fragmented and competitive; no single institution has a significant market share."

Thus, Defendants stated that:

> In every market in which DeVry University operates, there are numerous state institutions, community colleges, and independent universities. In particular, there is growing competitive pressure from community colleges, traditional universities, and technical colleges . . . . In addition, there is growing competition from online programs (by private-sector, publically-funded and independent institutions) and site-based private-

sector school programs.

61.    The 2011 10-K also discussed the Company's marketing and outreach, noting that:

> DeVry University currently advertises on various Internet sites, on television and radio, in magazines and newspapers, and utilizes telemarketing and direct mail to reach prospective students. DeVry University frequently updates its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education. DeVry University's highly integrated brand initiative focuses on the university's graduate employment success, while emphasizing DeVry University as an accredited, highly-respected academic institution. The brand campaign is grounded in ongoing in-depth consumer, marketplace and brand research, and leverages a number of channels, including broadcast, print and Internet advertising, public relations, and social media, as well as local marketing efforts.

62.    In addition, Defendants recognized that the Company's financial success – and that of its graduates – depends on the employment of its graduates.  Thus, the 2011 10-K stated with respect to DeVry University:

> DeVry University believes that the employment of its graduates is essential to the achievement of its mission and the ability to attract and retain students.

> DeVry University attempts to gather accurate data to determine how many of its undergraduates, both at the associate and bachelor's degree levels, are employed in positions related to their program of study within six months following graduation. To a large extent, the reliability of such data depends on the quality of information that graduates self-report.

> One measure of success is the employment outcomes of DeVry University graduates. Eighty-nine percent of DeVry University's June 2009, October 2009 and February 2010 graduates in the active job market were employed in fields of their study within six months of graduation at an average salary of $43,035.

63.    On October 6, 2011, Defendants caused the Company to issue a press release titled "Graduates from DeVry Inc. Schools Earn up to 65 Percent More with Degrees, According to New Research" which touted the value of a degree from DeVry

University:

> DeVry Inc. . . . a leading global provider of higher education, released a research study today showing that graduates increase their annual wages significantly when they earn a degree from DeVry University, Chamberlain College of Nursing or Carrington College California.
>
> The independent economic-impact analysis, conducted by The Cicero Group for DeVry Inc., tracked wage growth from 2003 to 2010 for graduates from three DeVry Inc. schools in seven states, as well as a control group of individuals who expressed interest in DeVry University, Chamberlain College of Nursing or Carrington College of California, but ultimately did not pursue a college degree. Both groups had statically similar starting salaries of $25,000-$27,000 in 2003. But by the end of the seven-year period, graduates form the three DeVry Inc. schools out-earned those in the control group by significant margins in all degree categories.
> Specifically, graduates who earned a bachelor's degree from a DeVry Inc. school increased their earnings by 65 percent to an average $44,262 at the end of the seven year period, compared to the control group's average final earnings of 18 percent, or $29,224. Associate degree earners saw wage growth of 42 percent to an average $39,478; and certificate holders increased their wages 22 percent to an average $31,782.

*     *     *

Economic Impact Beyond Graduate Wages

Beyond increases in graduate earnings, the study also analyzed the overall economic impact DeVry Inc. schools have on seven state and local economies. In California, Florida, Illinois, New Jersey, New York, Ohio and Texas, DeVry Inc. schools had a total economic impact of $822 million in FY2010, including $324 million in direct spending, which led to an additional $497 million in indirect sending. This overall impact is an increase of $135 million from the previous fiscal year.

*     *     *

"This research is yet one more example of DeVry's commitment to transparency and accountability. We want students, prospective students and taxpayers to have objective information to evaluate the impact of a DeVry education," Hamburger said. "By quantifying the ways in which our schools positively impact the careers of our students, as well as contribute to local and state economies, I hope people gain a better understanding of DeVry's overall value and our role in higher education in America."

64.     On October 25, 2011, Defendants caused the Company to issue a press release announcing financial results for 1Q 2012, ended September 30, 2011.   In that press release, Defendants announced quarterly revenues of $519 million (a 0.5% decrease from the prior year quarter) and earnings per share of $0.83 (a 19.4% decrease from the prior year quarter).   With respect to DeVry University graduates' employment statistics following graduation, Defendants noted that:

> Despite the continued tough job market, 87.3 percent of DeVry University's June 2010, October 2010 and February 2011 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $42,645. These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.

> The Company sought to hedge these numbers by qualifying that the employment figures "[e]xclude[] graduates continuing their education, foreign graduates ineligible to work in the United States/Canada and those unable to accept career advising because of extreme circumstances," and further "[e]xclude[] graduates who actively pursued employment for less than 180 days and did not become employed."

65.     Defendant Hamburger stated in the October 25, 2011 press release, "[w]e are confident that what we are seeing now is a near-term discontinuity in the long-term growth trend.   Our confidence is bolstered by the fundamental need for career-focused education both in the United States and in emerging markets, and by the strong value proposition we offer our students."   The October 25, 2011 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Gunst.

66.     On the same day that Defendants caused the Company to issue a press release announcing 1Q results, they held a 1Q 2012 Earnings Conference Call. Participating on the call were defendants Hamburger, Unzicker, and Gunst.   In his

opening presentation, defendant Hamburger discussed the value of a DeVry University

education with respect to employment following graduation.   Defendant Hamburger

noted that:

> [O]ur confidence is bolstered by this fundamental need for career focused
> education. And by the strong value proposition that we offer our students.
> Recently we released a study we had commissioned by the Cicero Group
> which tracked wage growth from 2003 to 2010 for graduates from three of
> our institutions in seven states alongside a control group of individuals
> who expressed interest in one of these colleges but ultimately didn't
> pursue a degree. By the end of the seven-year period, the Bachelor's
> Degree graduates from the DeVry institutions increased their earnings on
> average by 65%; compared to that control group, the average was 18%.
> And similarly for Associate Degree graduates, wages increased on average
> 42% compared to 22% for the control group. This study demonstrates that
> our graduates are receiving a significant return on their educational
> investment.
>
> As another indicator of the value proposition that we offer students, even
> in this tough job market, our graduate employment rate for DeVry
> University students in the active job market employed in their field of
> study within six months of graduation is 87%. Now the goal we hold
> ourselves accountable to had always been 9 out of 10. So to hold ourselves
> accountable, we're investing more resources to help our students like our
> new partnership with CareerBuilder.

67.     On November 4, 2011, Defendants caused the Company to filed its Form

10-Q with the SEC for the 1Q 2012 ended September 30, 2011 ("1Q 2012 Form 10-Q"),

which was signed by defendants Hamburger and Gunst.   The 1Q 2012 Form 10-Q

reiterated DeVry's previously reported financial results in its October 25, 2011 press

release, stating "[t]otal consolidated revenues for the first quarter of fiscal year 2012 of

$519.0 million decreased $2.4 million, or 0.5%, as compared to the year-ago quarter."

68.     With regard to student enrollment, the 1Q 2012 Form 10-Q emphasized

that:

> Management believes the decreases in enrollments were driven mainly by
> the negative impact on student decision making of the prolonged

economic downturn and economic conditions generally, resulting in a reduction of interest from potential students. In addition, management believes a near-term distraction of DeVry University employees associated with the implementation of new regulations also contributed to the decreases in DeVry University undergraduate enrollments. To address these issues, DeVry University is adding new programs and locations, and making investments to enhance the strength of its brand, improve customer service and increase awareness among potential students through new and innovative advertising campaigns.

69.     On December 12, 2011, Defendants caused the Company to issue a press release announcing Fall 2011 enrollment results for DeVry schools.  With regard to undergraduate student enrollment for DeVry University, the press release announced 13,558 new students (a 24.6% decrease from the prior year) and 64,112 total students (a 12.8% decrease from the prior year).  Defendants stated in the press release that "weak economic conditions and persistent unemployment continued to impact consumer confidence and enrollment results, coupled with adjustments associated with new regulations.  DeVry University continues to mitigate the effects of this challenging environment by prudently controlling costs, and by increasing employee training to improve the student admissions experience."

70.     Defendant Hamburger stated in the December 12, 2011 press release that "[w]hile we experienced lower enrollment at some of our institutions during this period, there's no change in the fundamental long-term demand for career-oriented education. . . . We are focused on turning around our performance in the near-term, and remain confident in our ability to grow over the long-term."  The December 12, 2011 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Gunst.

71.     On December 14, 2011, Defendants announced that defendant Wiggins

30

would replace defendant Gunst as DeVry's Senior Vice President, Chief Financial Officer, and Treasurer, effective January 3, 2012.

72.     On January 26, 2012, Defendants caused the Company to issue a press release announcing financial results for 2Q 2012, ended December 31, 2011.  In that press release, Defendants caused the Company to announce quarterly revenues of $524 million (a 5% decrease from the prior year quarter) and earnings per share of $0.13 (an 89.6% decrease from the prior year quarter).  For the six-month period ended December 31, 2011, Defendants also announced revenues of $1,043 million (a 2.8% decrease from the prior year period) and earnings per share of $0.97 (a 57.5% decrease from the prior year period).

73.     Defendant Hamburger stated in the January 26, 2012 press release that the Company was "disappointed with these results," but that it was nevertheless "focused on improving [its] performance by implementing initiatives that will drive revenue growth, while controlling costs."  As set forth in the press release, such initiatives included "[e]nhancing awareness to drive student interest in DeVry's career-oriented educational programs."  The January 26, 2012 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Wiggins.

74.     On February 6, 2012, Defendants caused the Company to file its Form 10-Q with the SEC for the 2Q 2012 for the quarter ended December 31, 2011 ("2Q 2012 Form 10-Q"), which was signed by defendants Hamburger and Wiggins, reiterating DeVry's previously reported financial results in the January 26, 2012 press release, stating:

> Total consolidated revenues for the second quarter of fiscal year 2012 of $524.0 million decreased $27.4 million, or 5%, as compared to the year-

ago quarter. For the first six months of fiscal year 2012, total consolidated revenues decreased $29.8 million, or 2.8%, to $1,043.1 million.

75. With regard to student enrollment, the 2Q 2012 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were driven primarily by the negative impact on student decision making of the prolonged economic downturn and economic conditions generally, resulting in a reduction of interest from potential students. In addition, management believes a short-term distraction of DeVry University employees associated with the implementation of new regulations also contributed to the decreases in DeVry University undergraduate enrollments. To address these issues, DeVry University is adding new programs and locations. It is also making investments to enhance the strength of its brand, improve customer service and increase awareness among potential students through new and innovative advertising campaigns.

76. On March 1, 2012, Defendants announced that defendant Unzicker had been named as the Company's Vice President, Finance and Chief Accounting Officer. Unzicker had previously been the Company's Vice President and Controller since 2008.

77. On April 24, 2012, Defendants caused the Company to issue a press release announcing financial results for 3Q 2012, ended March 31, 2012. In that press release, Defendants announced quarterly revenues of $540.8 million (a 4% decrease from the prior year quarter) and earnings per share of $1.00 (a 24% decrease from the prior year quarter). For the nine-month period ended March 31, 2012, the Company also announced revenues of $1,584 million (a 3% decrease from the prior year period) and earnings per share of $1.96 (a 45.6% decrease from the prior year period). Regarding undergraduate student enrollment for the DeVry University Spring 2012 session, the press release announced 12,025 new students (a 19.7% decrease from the prior year) and 60,196 total students (a 15.1% decrease from the prior year). Defendants stated in the press release that these enrollment results "were impacted by a focus on adjusting to new

regulations and prolonged unemployment, which continued to affect consumer confidence."

78.     Defendant Hamburger stated in the April 24, 2012 press release that the Company "continued to execute on [its] five-point performance improvement plan."  The April 24, 2012 press release was attached as an exhibit to a Form 8-K filed with the SEC on the following day, which was signed by defendant Unzicker.

79.     Also on April 24, 2012, Defendants held a 3Q 2012 Earnings Conference Call.  Participating on the call were defendants Hamburger, Unzicker, and Wiggins.  In response to a question posed by a securities analyst with respect to graduate employment statistics at the Chamberlain school, defendant Hamburger noted the following with respect to DeVry University:

> … and also the graduate employment statistics for DeVry University are also holding up pretty strong, still 80%. We're not meeting our 90% goal, but still holding up very well. It's more a factor of prospective students. We've just seen that among their environment or their neighbors or their friends, in the popular press just causing the hesitation on the front end. But the good news that help us spread the word is the graduates of institutions are doing quite well.

80.     On May 3, 2012, Defendants caused the Company to file its Form 10-Q with the SEC for the 3Q 2012 for the quarter ended March 31, 2012 ("3Q 2012 Form 10-Q"), which was signed by defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in its April 24, 2012 press release, stating:

> Total consolidated revenues for the third quarter of fiscal year 2012 of $540.8 million decreased $21.9 million, or 3.9%, as compared to the year-ago quarter. For the first nine months of fiscal year 2012, total consolidated revenues decreased $51.7 million, or 3.2%, to $1,583.9 million.

81.     With regard to student enrollment, the 3Q 2012 Form 10-Q emphasized

that:

> Management believes the decreases in enrollments were driven primarily by the negative impact on student decision making of the prolonged economic downturn and persistent unemployment, resulting in a reduction of interest from potential students. In addition, management believes a short-term distraction of DeVry University employees associated with the implementation of new regulations in July 2011, along with the heightened competition, also contributed to the decreases in DeVry University undergraduate enrollments. To address these issues, DeVry University is enhancing the effectiveness of its recruiting efforts.

> During the third quarter, DeVry University provided additional training to its admissions advisors on revisions that were made to their performance management system stemming from the implementation of new regulations in July 2011. It is also making investments to enhance the strength of its brand, improve customer service and increase awareness among potential students through new and innovative advertising campaigns.

82.     Less than a week later, on May 9, 2012, at the Robert W. Baird's Growth Stock Conference, in response to an analyst's question, defendant Hamburger recognized that career-oriented education is critical for DeVry University's competitive position:

> But the key is what's our competitive position, what's our value proposition, how are we going to enhance that to compete.

> And there what's really important is enhancing that focus on career-oriented education [still] enhancing, for example, our career services, and we've taken that up over the last couple of years to 200 career service and professionals just at DeVry University. So that is a way to compete with any other universities who (inaudible) a career service and don't offer that.

83.     On June 12, 2012, defendant Hamburger participated in and presented at the William Blair and Co. LLC Growth Stock Conference wherein he discussed the success of DeVry and in particular DeVry University student outcome statistics:

> So we have a diverse family of educational institutions, and they all share a common operating philosophy -- that is that quality leads to growth.

> Our focus on academic quality drives strong student outcomes that strengthens our reputation and results in continued enrollment growth.

And this growth ultimately leads to strong financial results as well.

*     *     *

So let me turn now to our long-term strategy for driving growth and value. Ask anyone at DeVry what our strategy is and they will summarize it for you in three words -- achieve, grow, and build.

Achieve superior student outcomes. How do we do that? By providing high-quality, career-oriented academics, service excellence, and innovative educational technology. . . . Many students are attracted by our focus on career-oriented education. . . . That's career-oriented academics.

84.     During the Question and Answer session, in response to a question from an unidentified audience member, defendant Hamburger confirmed that "[w]e revolve around basically two pillars.  One, our metrics of outcomes, and the other is standards of professional practice.  Some metrics of outcomes would include, do the students learn? Did they graduate?  Are they employed in their field of study?  Are they repaying their loans?"

85.     Defendants' use of Academic Annual Reports further contributed to Defendants' illicit scheme.  Thus, in a calculated move to assuage both shareholders' and prospective students' concerns about the success of the Company and its ability to attract students and thus generate revenues and earnings per share, Defendants released Academic Annual Reports which touted the success of DeVry University students in obtaining employment upon graduation (as set forth above and below).

86.     For example, on June 13, 2012, Defendants caused DeVry University to release its 2010-2011 Academic Annual Report, representing that 89% of all 2010 DeVry University graduates who earned a bachelor's degree were employed in their fields of study within six months of graduating.  In this regard, Defendants indicated that:

| 2010 Career Services Results by degree program — Combined statistics for students who graduated from the February 2010, June 2010 and October 2010 classes. | Graduates our whose they actively pursued and obtained employment and those already employed who sought education-related careers within 180 days of graduation | Average reported annual compensation [3] | Graduates | Graduates eligible for career assistance [4] | Graduates who actively pursued employment & were employed or those who were already employed [5] | Graduates employed in education-related positions within 180 days of graduation |
|---|---|---|---|---|---|---|
| **ASSOCIATE DEGREE PROGRAM** | | | | | | |
| Accounting | 75% | $33,066 | 90 | 70 | 56 | 42 |
| Electroneurodiagnostic Technology | 100% | $47,840 | 2 | 2 | 2 | 2 |
| Electronics & Computer Technology | 87% | $33,381 | 331 | 254 | 210 | 182 |
| Health Information Technology | 76% | $31,561 | 489 | 356 | 283 | 215 |
| Network Systems Administration | 84% | $38,263 | 540 | 329 | 248 | 209 |
| Web Graphic Design | 50% | $30,827 | 273 | 131 | 60 | 30 |
| **TOTAL** | 79% | $34,145 | 1,725 | 1,142 | 859 | 680 |
| **BACHELOR'S DEGREE PROGRAM** | | | | | | |
| Biomedical Engineering Technology [2] | 80% | $42,480 | 76 | 70 | 64 | 51 |
| Business Administration | 90% | $39,220 | 1,550 | 1,314 | 1,237 | 1,115 |
| Clinical Laboratory Science | 100% | $49,640 | 7 | 7 | 6 | 6 |
| Computer Engineering Technology | 80% | $37,369 | 134 | 119 | 105 | 84 |
| Computer Information Systems | 84% | $43,849 | 718 | 628 | 530 | 443 |
| Electronics Engineering Technology | 88% | $41,297 | 256 | 238 | 215 | 190 |
| Game & Simulation Programming | 63% | $38,847 | 374 | 334 | 226 | 143 |
| Multimedia Design & Development | 0% | N/A | 1 | 1 | 1 | 0 |
| Network & Communications Management | 90% | $44,287 | 511 | 462 | 411 | 369 |
| Technical Management | 92% | $46,649 | 3,608 | 3,052 | 2,827 | 2,594 |
| **TOTAL** | 89% | $43,953 | 7,235 | 6,225 | 5,622 | 4,995 |

87.     On July 23, 2012, Defendants caused the Company to issue a press release previewing financial results for 4Q 2012, ended June 30, 2012.  In that press release, the Company announced quarterly revenues of between $500 million and $510 million and earnings per share of between $0.43 and $0.46 before certain discrete items decreasing earnings by approximately $0.35 per share.  With regard to undergraduate student enrollment for the DeVry University Summer 2012 session, Defendants stated that they expected to report a decline of 15% to 17% in new enrollments.

88.     Defendant Hamburger stated in the July 23, 2012 press release, "[w]hile we are disappointed with this quarter's results, we are optimistic about mid- and long-term growth in higher education."  The July 23, 2012 press release was attached as an

exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

89.     On August 9, 2012, Defendants caused the Company to issue a press release announcing financial results for 4Q and full-year 2012, ended June 30, 2012.  In that press release, Defendants announced quarterly revenues of $505.9 million (a 7.5% decrease from the prior year quarter) and earnings per share of $0.12 (an 88.9% decrease from the prior year quarter).  For Fiscal 2012, Defendants also announced revenues of $2,089 million (a 4.2% decrease from the prior year) and earnings per share of $2.09 (a 55.3% decrease from the prior year).  With regard to undergraduate student enrollment for the DeVry University May 2012 session, the press release announced 5,730 new students (a 14.3% decrease from the prior year) and 60,044 total students (a 14.7% decrease from the prior year).  For DeVry University's July 2012 undergraduate session, the press release announced 7,532 new students (a decrease of 16.6% from the prior year) and 50,503 total students (a decrease of 15.8% from the prior year).  Defendants stated in the press release that "[e]nrollment results for DeVry University at both the undergrad and graduate levels continue to be negatively impacted by the prolonged economic downturn and low consumer confidence, trends being experienced across higher education."  The August 9, 2012 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

90.     On August 28, 2012, Defendants caused the Company to issue its 2012 Annual Report ("2012 AR") and filed with the SEC its Form 10-K ("2012 10-K") for the fiscal year ended June 30, 2012.  The 2012 10-K was signed by defendants Hamburger, Wiggins, Unzicker. Taylor, Begley, Brown, Logan, Wardell, and Ruiz.  In the 2012 AR,

the Company reported a decrease of 4% in revenues ($2,089,781,000 for 2012 compared to $2,182,371,000 in 2011), a decrease of 57% in net income ($141,565,000 for 2012 compared to $330,403,000 for 2011) and a decrease of 55% in earnings per share ($2.09 for 2012 compared to $4.68 in 2011).

91.     In his Fellow Owners, Students, Colleagues and Friends Letter, defendant Hamburger stated:

> 2012 proved to be a challenging year not just for DeVry but also for the entire U.S. higher-education system. . . . While our financial outcomes in 2012 were not what we wanted, our student outcomes were—and our investments in quality and capacity mean that we are poised to transition to recovery and growth in our enrollments and financial results. The years ahead hold tremendous promise for DeVry's institutions and our students. We are confident that our hard work in 2012 will yield greater opportunities in the years that follow.

92.     The 2012 10-K, in addition to noting the decrease in revenue, net income and earnings per share, reported the decrease in new student enrollment:

> New student undergraduate enrollment in July 2012 session decreased 16.6% to 7,532 students as compared to the prior year.

> Total undergraduate enrollment in July 2012 was 50,503 students, a decrease of 15.8% compared to 59,966 in the previous summer.

> There were 16,397 total students for the July 2012 session in DeVry University's graduate programs, including its Keller graduate school of Management, representing a decrease of 9.7% from the prior year.

93.     With respect to marketing and outreach, the 2012 10-K noted the following:

> DeVry University currently advertises on various Internet sites, on television and radio, in magazines and newspapers, and utilizes telemarketing and direct mail to reach prospective students. DeVry University frequently updates its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education. DeVry University's highly integrated brand

initiative focuses on the university's graduate employment success, while emphasizing DeVry University as an accredited, highly respected academic institution. The brand campaign is grounded in ongoing in-depth consumer, marketplace and brand research, and leverages a number of channels, including broadcast, print and Internet advertising, public relations, and social media, as well as local marketing efforts.

94.     In addition, Defendants recognized that the Company's financial success (and that of its graduates) depended on the employment of its graduates. Thus, the 2012 10-K stated with respect to DeVry University:

> As THE Career University, DeVry University believes that the employment of its graduates is essential to the achievement of its mission and the ability to attract and retain students.
>
> *        *        *
>
> DeVry University attempts to gather accurate data to determine how many of its undergraduates, both at the associate and bachelor's degree levels, are employed in positions related to their program of study within six months following graduation. To a large extent, the reliability of such data depends on the quality of information that graduates self-report.
>
> One measure of success is the employment outcomes of DeVry University graduates. Each year, thousands of DeVry University graduates have started careers in their chosen fields within 6 months or less of their graduation. Eighty-six percent of DeVry University's February 2011, June 2011 and October 2011 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $42,626. These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.

95.     On September 13, 2012, defendant Hamburger participated in and presented at the BMO Capital Markets Back to School Education Conference wherein he discussed the success of DeVry and in particular DeVry University graduates' employment statistics.  In response to an analyst's question about the thesis of investing in DeVry, he emphasized that "[e]verybody knows DeVry's reputation for quality.  And, certainly, students and families know DeVry. DeVry University equals careers.  They

know that reputation. Employers -- we have a great reputation with employers for those career outcomes."  In response to another question by the same analyst about DeVry's priorities, defendant Hamburger stated:

> The second area is regaining enrollment growth. That involves improving our marketing, recruiting and retention, all three of those count. Retention counts every bit as much as recruiting a new student. Marketing is focused on both the media mix in the tactics, as well as the message itself and the branding. So a lot of focus on social, digital, website optimization, search engine optimization. And we're adding to the dedicated group that we have doing that. The message -- reinforcement of our brand.
>
> *       *       *
>
> And then, recruiting -- we had a dislocation or a disruption in our conversion rates, is probably the best way to measure that, in July of 2011 when we had new regulations. So changing the way I do your performance review, Jeff, might change -- that might be a little distracting for you. And we've worked our way through that.
>
> So we've done a lot of training. For a while there, I think our admissions advisors kind of froze up, our managers froze up. They were not sure -- what am I allowed to say? What am I not allowed to say? So we've done a lot of training that says, you know what, don't focus on that. Focus on the student in front of you. You were compliant before. This is DeVry. You've never done the wrong thing. You're compliant now. But they needed to hear that.
>
> Because there was just sort of, hearing so much negative press and everything, wondering, am I doing something wrong? No, you're not doing anything wrong. And over the course of the year, we've worked our way through that. And now, I'd say that we are up a good 20%, 30% off the bottom, in terms of improving our conversion rate from where we were. And the result of all these efforts to improve our enrollments is actually starting to work.

96.     On October 25, 2012, Defendants caused the Company to issue a press release announcing financial results for 1Q 2013, ended September 30, 2012.  In that press release, Defendants caused the Company to announce quarterly revenues of $482.7 million (a 7% decrease from the prior year quarter) and earnings per share of $0.49 (a

41% decrease from the prior year quarter).  Regarding undergraduate student enrollment for the DeVry University September 2012 session, the press release announced 6,580 new students (an 8.6% decrease from the prior year) and 56,086 total students (a 14.9% decrease from the prior year).  With respect to the launch of DeVry University's marketing campaign underscoring employment for its graduates due to its "career-focused programs," Defendants noted:

> DeVry University recently launched a new advertising campaign that underscores the growing need for an educated workforce to fill tomorrow's jobs in high-demand sectors.
>
> As an example of the strong value proposition of our career-focused programs, graduate employment at DeVry University was 85.7 percent in the most recent annual reporting period. This average includes graduates of associate and bachelor's degree programs for the twelve-month period ending February 2012.

97.     A chart which appears in the press release notes that in addition to 85.7% of DeVry University graduates being employed, the average salary was $42,623 and that the "[i]formation presented is based on graduate-provided data."  In reaching the 85.7% number, Defendants misleadingly explained that the "[d]enominator excludes graduates continuing their education, foreign graduates ineligible to work in the United States/Canada and those unable to accept career advising assistance because of extreme circumstances, such as military service or critical illness," and the "[n]umerator excludes graduates who actively pursued employment for less than 180 days and did not become employed."

98.     The October 25, 2012 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

99.     On the same day, Defendants held a 1Q 2013 Earnings Conference Call.

Participating on the call were defendants Hamburger, Unzicker, and Wiggins.  In his opening presentation, defendant Hamburger discussed career-oriented education in terms of its return on investment (ROI) and return on educational investment (ROIE) and their relation to employment statistics of DeVry University graduates.  Defendant Hamburger noted that:

> DeVry's programs across all our institutions are focused on these types of high ROI programs or high ROEI programs. And this is why DeVry is so confident about the future. The new DeVry University employment statistic we announced today shows that 86% of DeVry University graduates who are active in the job market were employed in their field of study within 6 months of graduation. Average salary? $42,626. Now that's remarkable in this economy. It demonstrates the quality of our academic offerings and the return on investment for our students.

100.    On November 5, 2012, Defendants caused the Company to file its Form 10-Q with the SEC for the 1Q 2013 ended September 30, 2012 ("1Q 2013 Form 10-Q"), which was signed by defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in the Company's October 25, 2012 press release, stating "[t]otal consolidated revenues for the first quarter of fiscal year 2013 of $482.7 million decreased $36.3 million, or 7.0%, as compared to the year-ago quarter."

101.    With regard to student enrollment, the 1Q 2013 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were driven by the negative impact on student decision making from the prolonged economic downturn and persistent unemployment, resulting in a reduction of interest from potential students. In addition, management believes heightened competition contributed to the decreases in DeVry University undergraduate and graduate enrollments. To regain enrollment growth at DeVry University, management's plan includes channel-focused initiatives, technology and brand awareness. . . . DeVry University's brand awareness campaigns are helping drive higher quality inquires and steadily improving conversion rates.

102.    On February 4, 2013, Defendants caused DeVry University to release its 2011-2012 Academic Annual Report, indicating:

| 2011 Career Services Results by degree program<br>Combined statistics for students who graduated from the February 2011, June 2011 and October 2011 classes. | Graduates who actively pursued and obtained employment and those who were already in education-related careers within 180 days of graduation | Average reported annual compensation [2] | Graduates | Graduates eligible for career assistance [3] | Graduates who actively pursued employment for up to 180 days and those who were already employed [4] | Graduates employed in education-related positions within 180 days of graduation |
|---|---|---|---|---|---|---|
| **ASSOCIATE DEGREE PROGRAM** | | | | | | |
| Accounting | 74% | $33,287 | 159 | 97 | 88 | 65 |
| Electroneurodiagnostic Technology<br>(renamed Neurodiagnostic Technology November 9, 2013) | 100% | $35,321 | 9 | 8 | 8 | 8 |
| Electronics & Computer Technology | 82% | $37,043 | 336 | 218 | 201 | 165 |
| Health Information Technology | 69% | $33,321 | 849 | 523 | 460 | 318 |
| Network Systems Administration | 81% | $37,502 | 696 | 407 | 373 | 303 |
| Web Graphic Design | 52% | $31,739 | 412 | 140 | 110 | 57 |
| **ASSOCIATE TOTAL** | 74% | $35,327 | 2,461 | 1,393 | 1,240 | 916 |
| **BACHELOR'S DEGREE PROGRAM** | | | | | | |
| Biomedical Engineering Technology [1] | 81% | $43,568 | 113 | 101 | 94 | 76 |
| Business Administration | 91% | $38,180 | 1,703 | 1,334 | 1,269 | 1,150 |
| Clinical Laboratory Science | 100% | $44,075 | 15 | 14 | 14 | 14 |
| Computer Engineering Technology | 86% | $40,834 | 122 | 97 | 91 | 78 |
| Computer Information Systems | 85% | $44,178 | 806 | 613 | 570 | 484 |
| Electronics Engineering Technology | 91% | $44,386 | 285 | 240 | 232 | 211 |
| Game & Simulation Programming | 61% | $36,096 | 439 | 298 | 246 | 149 |
| Management | 100% | $29,062 | 9 | 5 | 5 | 5 |
| Multimedia Design & Development | 82% | $29,208 | 66 | 45 | 40 | 33 |
| Network & Communications Management | 90% | $43,838 | 543 | 433 | 407 | 366 |
| Technical Management | 90% | $47,001 | 4,099 | 3,176 | 3,033 | 2,726 |
| **BACHELOR'S TOTAL** | 88% | $43,849 | 8,200 | 6,356 | 6,901 | 5,292 |

**Graduate Employment Rates**

Even in today's challenging economic environment, a large percentage of 2011 DeVry University graduates in the active job market were either employed in their fields before graduating or found jobs within six months of graduation. For those who earned associate degrees, the employment rate was 74 percent; the rate was 88 percent for those who earned bachelor's degrees[5].

103.    As is evident from the above chart, Defendants again boasted that "[n]inety percent of DeVry University's 2012 graduates who were actively seeking employment had careers in their field within six months of graduation, at an average salary of $43,538."

104.    On February 6, 2013, Defendants caused the Company to issue a press release announcing financial results for 2Q 2013, ended December 31, 2012.  In that press release, Defendants announced quarterly revenues of $505 million (a 3.6% decrease

from the prior year quarter) and earnings per share of $0.78 (a 500% increase from the prior year quarter). For the six-month period ended December 31, 2012, Defendants also announced revenues of $988 million (a 5.3% decrease from the prior year period) and earnings per share of $1.27 (a 30.9% increase from the prior year period). Regarding undergraduate student enrollment for the DeVry University November 2012 session, the press release announced 6,488 new students (a 15.5% decrease from the prior year) and 60,103 total students (a 17.6% decrease from the prior year). For DeVry University's January 2013 undergraduate session, the press release announced 5,593 new students (a 4.7% decrease from the prior year) and 62,435 total students (a 14.9% decrease from the prior year). Defendant Hamburger stated in the February 6, 2013 press release that "DeVry's focus on quality and diversification is helping us as we work through the cyclical weakness." The February 6, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

105. Also on February 6, 2013, Defendants held a 2Q 2013 Earnings Conference Call. Participating on the call were defendants Hamburger, Unzicker, and Wiggins. In response to a question concerning how DeVry University is enticing students to enroll in the University, defendant Hamburger pointed to the statistic that graduates are employed in their field of study with 6 months of graduation as a fact for attracting students:

> [Question:] You both alluded to the fact that the issue with DeVry University seems to be inquiry that the top of the channel being challenging. I'm just curious how you're changing your message to students, prospective students, to make it less challenging to entice them to enroll. . . .
>
> [Hamburger:] Sure. We're really focusing on DeVry's long-time reputation for being the career university. . . . We've been at this for

decades and we've got a long track record of a data, third-party review data back to 1975. And since that time our graduates in the active job market have been employed within their field of study within 6 months of graduation. So that's the kind of message that we think is important to tell[.]

106. On February 7, 2013, Defendants caused the Company to file its Form 10-Q with the SEC for the 2Q 2013 for the quarter ended December 31, 2012 ("2Q 2013 Form 10-Q"), which was signed by defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in its February 6, 2013 press release, stating "[t]otal consolidated revenues for the second quarter of fiscal year 2013 of $505.2 million decreased $18.8 million, or 3.6%, as compared to the year-ago quarter. For the first six months of fiscal year 2013, total consolidated revenues decreased $55.1 million or 5.3% to $988.0 million."

107. With regard to student enrollment, the 2Q 2013 Form 10-Q emphasized that:

Management believes the decreases in enrollments were driven by the negative impact on student decision making from the prolonged economic downturn and persistent unemployment, resulting in a reduction in interest from potential students. In addition, management believes heightened and innovated competition from both public and private sector education providers contributed to the decreases in DeVry University undergraduate and graduate enrollments. To regain enrollment growth at DeVry University, management's plan includes channel focused initiatives, technology and brand awareness. . . . DeVry University's brand awareness campaigns are helping drive higher quality inquires and steadily improving conversion rates.

108. On February 26, 2013, defendant Wiggins participated in and presented at the Robert W. Baird and Co. Business Solutions Conference wherein he discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

As Daniel Hamburger said recently and I thought very aptly, he said, when the students think about advancing their education, one thing that is

guaranteed is the debt. And I think in their minds they are not sure that the career at the end is there. Even though at DeVry University, we have very good statistics, some 88% of students that persist and graduate, if you look at those that are actively looking within six months, will find a position in their field of study, and the average pay is $43,000.

So that's a message I think we can do a better job articulating to the students, and that is because we are very much career focused.

*       *       *

And one of the things that is encouraging when we look at DeVry University, one, is that we have these good employment statistics; two, we know that we do well in supporting students to get through this process.

109.    On March 6, 2013, Defendants caused the Company to issue a press release announcing that DeVry University had received reaffirmation of its accreditation by the Institutional Actions Council of The Higher Learning Commission of the North Central Association of Colleges and Schools.  As explained in the press release, the Higher Learning Commission accredits degree-granting educational institutions such as DeVry University, and is recognized by the DoE.  The March 6, 2013 press release stated that more information regarding DeVry University's accreditation could be found at http://www.ncahlc.org.  That website provides information concerning the accreditation process and the criteria for accreditation of educational institutions.  Notably, such criteria include the requirement that an "institution evaluates the success of its graduates" including by "assur[ing] that the degree or certificate programs it represents as preparation for advanced study or employment accomplish these purposes."  The criteria also require that an institution "looks to indicators it deems appropriate to its mission, such as employment rates[.]"  The March 6, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

110.    On March 13, 2013, defendant Hamburger participated in and presented at the Credit Suisse 15th Annual Global Services Conference wherein he discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

Well, the other measures of quality is successful student outcomes.

. . . At DeVry University, nearly 86% of our graduates in the active job market were employed in their field of study within 6 months of graduation. And these graduates earned an average salary of over $43,000. So that's a marker of academic quality.

*          *          *

One question that we've been asked is, how do we compete? How does DeVry compete? What is it that attracts students to our institutions in this competitive environment that's out there in higher education? We referred to it as HIRE education. That's spelled a little bit differently, HIRE. The H is for hands-on, small class sizes, individual attention, from professors who know you by name, not a number. The I, in 3 years, you can get a 4 year Bachelor's degree. In other words, that's speed to the degree. The R is for the reputation that our institutions enjoy with students, with accreditors and especially, with employers. And that leads to the E, incredible employment outcomes, like the 86% employed [at] $43,000 that I referenced earlier [at] DeVry University.

111.    On April 15, 2013, Defendants caused the Company to announce that the Company had received a subpoena from the Office of the Attorney General of the State of Illinois and a Civil Investigative Demand issued by the Office of the Attorney General of the Commonwealth of Massachusetts.  Defendants caused the Company to state that the Illinois subpoena "was issued pursuant to the Illinois False Claims Act in connection with an investigation concerning whether the compensation practices of DeVry and certain of its affiliates are in compliance with the Incentive Compensation Ban of the Higher Education Act."  Moreover, the Massachusetts demand "was issued in connection with an investigation into whether DeVry caused false claims and/or false statements to be submitted to the Commonwealth of Massachusetts relating to student loans,

guarantees, and grants provided to DeVry's Massachusetts students." Defendants stated that they could not predict the outcome of the investigations at that time.

112.    On April 23, 2013, Defendants caused the Company to issue a press release announcing financial results for 3Q 2013, ended March 31, 2013. In that press release, Defendants announced quarterly revenues of $509 million (a 5.9% decrease from the prior year quarter) and earnings per share of $0.88 (a 12% decrease from the prior year quarter). For the nine-month period ended March 31, 2013, the Company also announced revenues of $1,497 million (a 5.5% decrease from the prior year period) and earnings per share of $2.15 (a 9.7% increase from the prior year period). Regarding undergraduate student enrollment for the DeVry University March 2013 session, the press release announced 6,533 new students (a 21.2% decrease from the prior year) and 56,958 total students (a 16.5% decrease from the prior year). Defendants stated that while "[e]nrollment results continue to be impacted by lower cyclical demand among the university's target segment of students," the Company's "plan to improve enrollment results includes enhancing communications to students about DeVry University's excellent graduate employment results[.]" The April 23, 2013 press release was attached as an exhibit to a Form 8- K filed with the SEC on the same day, which was signed by Defendant Unzicker.

113.    Also on April 23, 2013, Defendants held a 3Q 2013 Earnings Conference Call. Participating on the call were defendants Hamburger, Unzicker, and Wiggins. In his opening presentation, defendant Hamburger discussed the steps the Company was taking to increase enrollment growth at DeVry University, which included becoming aggressive in its message that that a degree from DeVry University translates into quick

employment at a very good salary.  Defendant Hamburger stated:

> [L]et's focus on the steps that we're taking to address these challenges and regain . . . enrollment growth at DeVry University.
>
> Our strategy is centered on the fact that DeVry University offers a very strong return on investment, and we need to do more to demonstrate this inherent value proposition to prospective students.
>
> So first we're changing our message to be more hard hitting on DeVry University as the career university. You know, 86% of graduates active in the job market are employed in their field of study within 6 months of graduation, and that's with an average salary over $43,000. And the percent is trending up as we're going through this fiscal year. So we're going to do a better job communicating these impressive results to prospective students.

114.    On May 3, 2013, Defendants caused the Company to file its Form 10-Q with the SEC for the 3Q 2013 for the quarter ended March 31, 2013 ("3Q 2013 Form 10-Q"), which was signed by defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results reiterating in its February 6, 2013 press release, stating "[t]otal consolidated revenues for the third quarter of fiscal year 2013 of $508.8 million decreased $32.1 million, or 5.9%, as compared to the year-ago quarter.  For the first nine months of fiscal year 2013, total consolidated revenues decreased $87.2 million or 5.5% to $1,497 million."

115.    With regard to student enrollment, the 3Q 2013 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were due to lower cyclical demand from the University's target student segment driven by the prolonged economic downturn, persistent unemployment, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction of interest from potential students. In addition, management believes heightened competition from both public-sector and private-sector education providers and issues with internal execution contributed to the decreases in DeVry University undergraduate and graduate enrollments. To regain enrollment growth at DeVry

University, management's plan includes channel- focused initiatives, technology improvements and brand awareness.

116.    On June 13, 2013, defendant Hamburger participated in and presented at

the William Blair Growth Stock Conference wherein he again discussed the success of

DeVry and in particular DeVry University graduates' employment statistics:

> So in addition to academic quality investments, the other measure that I would give you of academic quality is successful student outcomes. . . . At DeVry University, nearly 86% of our graduates in the active job market were employed in their field of study within six months of graduation. And these graduates earned an average salary of $43,000[.]

> *        *        *

> And so we are confident in the growth opportunities over the long-term, and for private sector education specifically, but for DeVry in particular. For three main reasons. First, there's a growing need for career-oriented education. . . . . The second reason is strong ROI from education -- or, as we like to refer to it, an ROEI -- Return On Educational Investment. The US Census Bureau recently released a report showing that the difference in lifetime earnings between a high school grad and a college grad is $1 million. The difference, of course, even greater in fields like engineering, computer science, and healthcare. And DeVry is focused on these types of high ROEI programs.

> *        *        *

> And so we are confident in long-term growth, given this growing need for career-oriented education, the public sector struggling to meet the demand, and the strong ROEI. And we think perspective students understand ROEI very well. But right now, many are waiting. They're just not sure if this is the right time to commit to college. And this leads us to believe that there may be some pent-up demand building to be released as the economy improves.

117.    In response to a question from an unidentified audience member

concerning the Department of Education's scrutiny of employment statistics, defendant

Hamburger stated:

> Okay, so, two-part question. How would the Department of Education, which has increased scrutiny on higher education generally, as well as in

the private sector specifically, view our outcomes? And then how about that -- those employment results, of the 86% I mentioned? By the way, that's our goal, is that 9 out of 10 DeVry University graduates in their -- in the after-job market should be employed in their field of study, not just any job, in their field of study within six months. Not 12 months, not 100 years.

It's got to be within six months.

Third party reviewed statistics that we have disclosed publicly with third-party review since 1975. So there is a lot of talk now about more disclosure. We should have tough rules and make everybody disclose it. We have been disclosing it for a long time. . . . I don't know of too many universities that even talk about what their current statistics are, let alone have third-party review. And despite those on their website and hand that to every prospective student who interviews. I think the Department of Education would also acknowledge, and has many times, that there are good actors and bad actors in the public sector and the private sector. There is no monopoly on one or the other. We need to make sure we have strong rules of the road for all.

*    *    *

And that's our advocacy at DeVry, is basically, two pillars – pillar one is outcomes metrics. So, are the students learning? Are they graduating? Are they repaying their loans? Are they employed?

And pillar two is professional standards, conduct, strong disclosure, professional standards, maybe even like a trial period where kind of like when you buy a car, you can return it in three days or something like that.

118.    On August 8, 2013, Defendants caused the Company to issue a press release announcing financial results for 4Q and full year 2013, ended June 30, 2013.  In that press release, Defendants announced quarterly revenues of $480 million (a 4.4% decrease from the prior year quarter) and a per share loss of $0.51 ($0.63 lower than the prior year quarter).  For the entirety of Fiscal 2013, Defendants also announced revenues of $1,964 million (a 5.2% decrease from the prior year) and earnings per share of $1.65 (a 21.1% decrease from the prior year).  Regarding undergraduate student enrollment for the DeVry University May 2013 session, the press release announced 4,616 new students

(a 19.4% decrease from the prior year) and 48,842 total students (an 18.7% decrease from the prior year).  For DeVry University's July 2013 session, the press release announced 5,674 new students (a 24.7% decrease from the prior year) and 42,374 total students (a 16.1% decrease from the prior year).  Defendants stated in the press release that "DeVry University is focused on highlighting the university's strong value proposition to students."

119.    In the August 8, 2013 press release, Defendants caused the Company to note under the heading "Academic and operational accomplishments" that "[t]he percentage of DeVry University graduates who were actively seeking employment and had careers in their field within 6 months of graduation increased to 90 percent in calendar 2012," at an average salary of $43,

120.    As a misleading caveat to these figures, Defendants caused the Company to state that the employment and salary statistics are "based on 2012 graduates' self-reported data to DeVry University Career Service Center who were employed at graduation or who were actively seeking employment after graduation and found employment in their field within six months."  Defendants hedged, noting that these figures "[do] not include graduates who were not actively seeking employment, as determined by DeVry University Career Services, or who did not report data on employment status to DeVry University Career Services."

121.    In addition, defendant Hamburger stated in the August 8, 2013 press release that "[w]e are responding to a challenging environment by executing a turnaround plan at DeVry University and Carrington including aligning our cost structure, regaining enrollment growth and making targeted investments to drive future growth.  Our formula

of quality plus diversification equals growth is helping us as we work through the cyclical weakness and we remain confident in the opportunities for long-term growth in career-oriented education."   The August 8, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

122.    On the same day, Defendants held a 4Q 2013 Earnings Conference Call. Participating on the call were defendants Hamburger, Unzicker, and Wiggins.   In his opening presentation, defendant Hamburger touted the improved DeVry University graduate employment statistics as a result of its marketing campaign emphasizing the value of a DeVry University degree after graduation.  Defendant Hamburger noted that:

> A recent Gallup poll found that the factor adult Americans say is most important in selecting a college is the percent of graduates who find a good job. This is what DeVry University does. The latest numbers are in, and DeVry University employment statistics increased to more than 90%. 90% of our graduates in the active job market are employed in their field of study within six months of graduation. And they're earning an average of over $43,500.
>
> That's higher than the median family household income of our students before they enrolled at DeVry University.
>
> Employers see value from DeVry University, as they repeatedly hire our graduates to fill their jobs. And they send their existing employees to us for continuing education as well. New students from our corporate and government partnerships have grown more than 20%. Today, we have more than 400 agreements in place.
>
> We work with corporations, including Walmart, Xerox, Allstate, and others.
>
> Three of our DeVry University campuses placed in the top 100 for return on investment in a ranking by PayScale, and they rated over 1,000 institutions. PayScale's report examined the return on investment given the cost of tuition and the payoff in lifetime earnings. And out of that, we had three in the top 100.

*        *        *

Moving to regaining enrollment growth, the biggest factors depressing demand at DeVry University as well as the overall education market in the U.S. continue to include prospective students' lack of confidence in the job market and in the ROI of college. So the plan to increase enrollment starts with sharpening the communication of DeVry University's value proposition, which is educational quality, career outcomes, and exceptional student support. We'll more aggressively communicate this value proposition, including new, more focused advertising.

Our plan includes investing $20 million more in media spend in fiscal 2014, increasing our weeks on air by about 50%. And we're funding this from other marketing areas, so our overall marketing spend will be flat.

123.    On August 29, 2013, Defendants caused DeVry to release its 2013 Annual Report filed on Form 10-K (the "2013 10-K"), which included a Letter to Shareholders signed by defendant Hamburger.    In the 2013 Letter to Shareholders, Defendants emphasized that the best way to measure the quality of DeVry's education is to gauge the successful outcomes of its students.    To this end, Defendants asserted that "90 percent of DeVry University's 2012 graduates active in the job market were employed in their fields of study within six months of graduation, earning an average of more than $43,500 annually."    The 2013 10-K was signed by defendants Hamburger, Taylor, Begley, Brown, Logan, Merten, Wardell and Ruiz.

124.    In the 2013 10-K, Defendants reported a decrease of 5% in revenues ($1,964,375,000 for 2013 compared to $2,071,783,000 in 2012), a decrease of 24% in net income ($106,786,000 for 2013 compared to $141,565,000 for 2012), and a decrease of 21% in earnings per share ($1.65 for 2013 compared to $2.09 for 2012).

125.    In his Fellow Owners, Students, Colleagues and Friends Letter, defendant Hamburger noted the "challenging time" and the "current economic environment" which impacted the Company's financial performance:

We felt the impact in lower 2013 enrollments at DeVry, which represents

half of our organization and therefore had a significant effect on our results: revenues decreased 5 percent to $1.96 billion, and net income declined 25 percent to $107 million.

126. Defendant Hamburger, referencing the University's student outcome statistics, was upbeat about the future of the Company, expressing confidence in its "turnaround plan" "because DeVry University's value proposition is fundamentally strong." Specifically, defendant Hamburger noted that:

> The best measure of our quality is the successful outcomes that our students achieve. Notably, 90 percent of DeVry University's 2012 graduates active in the job market were employed in their fields of study within six months of graduation, earning an average of more than $43,500 annually.

127. The 2013 10-K noted in addition to the decrease in revenue, net income and earnings per share, the decrease in new student enrollment:

> New student undergraduate enrollment in July 2013 session decreased 24.7% to 5,674 students as compared to the prior year.

> Total undergraduate enrollment in July 2013 was 42,374 students, a decrease of 16.1 % compared to 50,503 in the previous summer.

> There were 13,281 total students for the July 2013 session in DeVry University's graduate programs, including its Keller Graduate School of Management, representing a decrease of 19.0 % from the prior year.

128. With respect to the Company's marketing, the 2013 10-K noted that:

> DeVry University currently advertises on various Internet sites, on television and radio, in magazines and newspapers, and utilizes telemarketing and direct mail to reach prospective students. DeVry University frequently updates its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education. DeVry University's highly integrated brand initiative focuses on the university's graduate employment success, while emphasizing DeVry University as an accredited, highly respected academic institution. The brand campaign is grounded in ongoing in-depth consumer, marketplace and brand research, and leverages a number of channels, including broadcast, print and Internet advertising, public relations, and social media, as well as local marketing efforts.

129.   In addition, Defendants recognized that the Company's financial success –

and that of its graduates – depended on the employment of its graduates.  Thus, the 2013

10-K stated with respect to DeVry University:

> As The Career University, DeVry University believes that the employment
> of its graduates is essential to the achievement of its mission and the
> ability to attract and retain students. DeVry University attempts to gather
> accurate data to determine how many of its undergraduates, both at the
> associate and bachelor's degree levels, are employed in positions related
> to their program of study within six months following graduation. To a
> large extent, the reliability of such data depends on the quality of
> information that graduates self-report. One measure of success is the
> employment outcomes of DeVry University graduates. Each year,
> thousands of DeVry University graduates have started careers in their
> chosen fields within 6 months or less of their graduation. Ninety percent
> of DeVry University's calendar 2012 graduates in the active job market
> were employed in their fields of study within six months of graduation at
> an average salary of $43,539. These statistics include graduates of
> associate and bachelor's degree programs and those who were already
> employed in their field of study.

130.   On October 24, 2013, Defendants caused the Company to issue a press

release announcing financial results for 1Q 2014, ended September 30, 2013.  In that

press release, Defendants announced quarterly revenues of $450.9 million (a 6% decrease

from the prior year quarter) and a loss per share of $0.11 ($0.60 less than the prior year

quarter).   In regard to undergraduate student enrollment for the DeVry University

September 2013 session, the press release announced 6,589 new students (a 0.1%

increase from the prior year) and 46,966 total students (a 16.3% decrease from the prior

year).

131.   Defendant Hamburger stated in the October 24, 2013 press release that the

Company was executing on its "formula of quality plus diversification equals growth,

which is mitigating the cyclical weakness in certain segments of U.S. postsecondary

education." Defendant Hamburger added that the Company's "turnaround plans at DeVry University and Carrington Colleges are producing early signs of operational improvement." The October 24, 2013 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

132.   On November 5, 2013, Defendants caused the Company to file its Form 10-Q with the SEC for the 1Q 2014 for the quarter ended September 30, 2013 ("1Q 2014 Form 10-Q"), which was signed by defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in the Company's October 24, 2013 press release, stating "[t]otal consolidated revenues for the first quarter of fiscal year 2014 of $450.9 million decreased $29.0 million, or 6.0%, as compared to the year-ago quarter."

133.   With regard to student enrollment, the 1Q 2014 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were due to lower demand from DeVry University's target student segment driven by the prolonged low level of economic growth, persistent higher levels of unemployment, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. In addition, management believes heightened competition from both public-sector and private-sector education providers contributed to the decreases in DeVry University undergraduate and graduate enrollments. To improve performance at DeVry University, management is focused on implementing a turnaround plan which includes these points:
>
> · Further improve academic quality;
> · Align the cost structure with enrollment levels;
> · Regain enrollment growth;
> · Make targeted investments with the intent to drive future growth; and
> · Manage the change, while developing the team.
>
> *       *       *
>
> The plan to stabilize enrollments includes communication of DeVry University's value proposition, which is education quality, career

prospects and high levels of student services.

134.    On November 6, 2013, Defendants caused the Company to announce that it had changed its name from DeVry Inc. to DeVry Education Group Inc.

135.    On December 10, 2013, Defendants caused DeVry University to release its 2012-2013 Academic Annual Report stressing that "90 percent of DeVry University graduates who were actively seeking employment in 2012 had careers in their fields within six months of graduation." To that effect, Defendants indicated:

## Graduate Employment Rate and Return on Investment

One critical measure of our success is the employment outcomes of DeVry University graduates. Ninety percent of DeVry University's 2012 graduates who were actively seeking employment had careers in their field within six months of graduation, at an average salary of $43,538. (These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.) We believe that our graduates' employment in fields related to their programs of study is essential to achieving our mission and to strengthening our ability to attract and retain students.

| 2012 Career Services Results by degree program Combined statistics for students who graduated from the February 2012, June 2012, October 2012 and December 2012 classes | Graduates who actively pursued and obtained employment in education-related career within 180 days of graduation | Average annual compensation[1] | Graduates | Graduates eligible for career assistance[2] | Graduates who actively pursued employment (i.e. up to 180 days and those who were already employed)[3] | Graduates employed in education-related positions within 180 days of graduation |
|---|---|---|---|---|---|---|
| **ASSOCIATE DEGREE PROGRAM** | | | | | | |
| Accounting | 90% | $33,892 | 234 | 144 | 124 | 112 |
| Electronics & Computer Technology | 91% | $37,395 | 378 | 246 | 215 | 195 |
| Health Information Technology | 79% | $31,847 | 1,018 | 619 | 522 | 411 |
| Network Systems Administration | 87% | $39,937 | 797 | 437 | 377 | 329 |
| Neurodiagnostic Technology | 100% | $37,960 | 7 | 7 | 7 | 7 |
| Web Graphic Design | 64% | $33,327 | 403 | 145 | 88 | 56 |
| **ASSOCIATE TOTAL** | **83%** | **$35,436** | **2,837** | **1,598** | **1,333** | **1,110** |
| **BACHELOR'S DEGREE PROGRAM** | | | | | | |
| Biomedical Engineering Technology | 90% | $45,281 | 110 | 98 | 88 | 79 |
| Business Administration | 92% | $38,558 | 1,911 | 1,536 | 1,430 | 1,318 |
| Clinical Laboratory Science | 100% | $46,176 | 26 | 23 | 21 | 21 |
| Computer Engineering Technology | 87% | $44,421 | 119 | 102 | 93 | 81 |
| Computer Information Systems | 89% | $44,651 | 901 | 697 | 633 | 562 |
| Electronics Engineering Technology | 93% | $48,208 | 318 | 282 | 269 | 249 |
| Game & Simulation Programming | 69% | $38,688 | 362 | 248 | 194 | 133 |
| Justice Administration | 100% | $76,000 | 4 | 3 | 2 | 2 |
| Management | 96% | $42,353 | 74 | 52 | 48 | 46 |
| Multimedia Design & Development | 84% | $32,251 | 196 | 127 | 92 | 77 |
| Network & Communications Management | 93% | $44,891 | 660 | 525 | 494 | 461 |
| Technical Management | 94% | $48,101 | 4,620 | 3,614 | 3,413 | 3,196 |
| **BACHELOR'S TOTAL** | **92%** | **$45,031** | **9,301** | **7,307** | **6,777** | **6,225** |

136.    Throughout 2013, Defendants ran an advertisement on numerous national

cable and satellite TV channels titled "Graduation Present."  The advertisement contained the following statements and depictions:

    a.    A DVU student narrates the advertisement.  She concludes by stating: "And when I finish my degree in business, a new job at a great company––that's the graduation present I want."

    b.    Immediately after the student refers to wanting a new job at a great company, an announcer states: "In 2012, 90% of DeVry University grads actively seeking employment had careers in their field in six months."

    c.    While the announcer is speaking, the following screen appears, with people walking in the background, for approximately five seconds:



    The text in the middle of the screen reads: "90% of our grads actively seeking employment had careers in 6 months"

    d.    The screen with the text then disappears, and the announcer then states: "Join the 90%. Learn how at devry.edu"

137.    Between October 2013 and April 2014, Defendants disseminated another advertisement on numerous national cable and satellite TV channels, which Defendants titled "Roommates."  The advertisement, which appeared in the Spanish language, contained the following statements and depictions:

a.     During this advertisement, the announcer states: "En el 2012, el 90% de los graduados de DeVry University que buscaron empleo de forma activa ejercían su carrera en menos de 6 meses." (Translation: "In 2012, 90% of graduates from DeVry University actively seeking employment had careers in less than 6 months.")

b.     While the announcer is speaking, the following screen appears, for approximately five seconds:



The text in the middle of the screen reads: "el 90% de nuestros graduados que buscaron empleo de forma activa ejercían su carrera en 6 meses." (Translation: "90% of our grads actively seeking employment had careers in 6 months.").

138.   In 2013, Defendants also advertised DeVry's 90% and higher income claims on various webpages on the DeVry University website, at www.devry.edu.  Some examples include:





139.    On February 4, 2014, Defendants caused the Company to issue a press release announcing financial results for 2Q 2014, ended December 31, 2013.  In that press release, the Company announced quarterly revenues of $491.3 million (a 1.9% decrease from the prior year quarter) and earnings per share of $0.74 (a 5.1% decrease from the prior year quarter).  For the six-month period ended December 31, 2013, Defendants also announced revenues of $942.2 million (a 3.9% decrease from the prior year period) and earnings per share of $0.63 (a 50.4% decrease from the prior year

period).   Regarding undergraduate student enrollment for the DeVry University November 2013 session, the press release announced 4,824 new students (a 12% decrease from the prior year) and 43,726 total students (an 11.7% decrease from the prior year). For the January 2014 session of DeVry University's undergraduate program, the press release announced 4,911 new students (a 7.9% decrease from the prior year) and 45,097 total students (a 15.1% decrease from the prior year).

140.   Defendant Hamburger stated in the February 4, 2014 press release that DeVry's "formula of quality plus diversification equals growth is mitigating the current weakness in certain segments of U.S. postsecondary education."   The February 4, 2014 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

141.   On the same day, Defendants caused the Company to file its Form 10-Q with the SEC for the 2Q 2014 ended December 31, 2013 ("2Q 2014 Form 10-Q"), which was signed by defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in the Company's February 4, 2014 press release, stating "[t]otal consolidated revenues for the second quarter of fiscal year 2014 of $491.3 million decreased $9.4 million, or 1.9%, as compared to the year-ago quarter. For the first six months of fiscal 2014, total consolidated revenues decreased $38.4 million or 3.9% to $942.2 million."

142.   With regard to student enrollment, the 2Q 2014 Form 10-Q emphasized that:

> Management believes the decreases in enrollments were due to lower demand from DeVry University's target student segment driven by the prolonged low level of economic growth, persistent higher levels of unemployment, negative perceptions of the value of a college degree and

increased reluctance to take on debt, resulting in a reduction in interest from potential students. In addition, management believes heightened competition from both public-sector and private-sector education providers contributed to the decreases in DeVry University undergraduate and graduate enrollments. To improve performance at DeVry University, management is executing a turnaround plan which includes:

· Sharpening DeVry University's value proposition which is education quality, career outcomes and exceptional student support;

· Strategic use of scholarships to attract new students and improve student persistence.

*      *      *

The plan to stabilize enrollments includes communication of DeVry University's value proposition, which is education quality, career prospects and high levels of student services.

143.    Also on February 4, 2014, Defendants caused the Company to disclose that, on January 28, 2014, it had received "a compulsory request from the FTC to provide documents and information relating to the advertising, marketing, or sale of secondary or postsecondary educational products or services or educational accreditation products or services by DeVry Group during the past five years."  Defendants caused the Company to explain that the "purpose of the request is to determine whether unnamed persons and/or entities have violated or are violating Section 5 of the Federal Trade Commission Act and, if so, to determine whether further FTC action would be in the public interest."

144.    Several securities analysts expressed limited concern about the FTC's "compulsory request" to DeVry to provide information relating to the advertising, marketing, or sale of educational products or services during the past five years. Wells Fargo Securities remained upbeat suggesting that the "compulsory requests for marketing information from DeVry for the past five years from the FTC represents a rare regulatory blemish" and noted that the request was "likely part of an effort announced last

September that has included a number of lead generation companies and involves coordinated efforts with the Department of Education, the [Consumer Financial Protection Bureau], the Department of Justice and various states." In fact, Wells Fargo went as far as stating that "DeVry's marketing practices are among the most circumspect in the group, in our opinion, and much more comparable to typical not-for-profit school advertising than to that of its for-profit brethren and so we rate the prospect of a 'federal case' as unlikely." Deutsche Bank considered the FTC inquiry as "odd" because it did not originate from a state attorney general, the SEC, or the Consumer Financial Protection Bureau.

145. Deutsche Bank expressed its belief that "this is the first school specific FTC inquiry since the late 1990s so it is unclear if other schools will be receiving similar requests or if the FTC is only looking at DeVry." Securities analysts' lack of concern about the FTC's investigation reflected that they had been misled by the years of flawed data that Defendants had spoon-fed them in pushing the narrative that approximately 90% of DeVry University graduates were placed in jobs in their field of study within six months at salaries that typically exceeded $43,000.

146. On April 24, 2014, Defendants caused the Company to issue a press release announcing financial results for 3Q 2014, ended March 31, 2014. In that press release, Defendants announced quarterly revenues of $496.1 million (a 1.5% decrease from the prior year quarter) and earnings per share of $0.86 (a 2% decrease from the prior year quarter). For the nine-month period ended March 31, 2014, Defendants also announced revenues of $1,438 million (a 3.1% decrease from the prior year period) and earnings per share of $1.49 (a 30.7% decrease from the prior year period). Regarding

undergraduate student enrollment for the DeVry University March 2014 session, the press release announced 5,018 new students (a 2.5% decrease from the prior year) and 42,583 total students (a 10.4% decrease from the prior year).

147.    Defendant Hamburger stated in the April 24, 2014 press release:

During the quarter we made good progress on our plan to turn around and transform DeVry University, including narrowing the rate of decline in new student enrollment, improving student persistence, and accelerating our cost reduction initiatives. As we look ahead to fiscal 2015, we will continue to enhance our strong student value proposition and to grow and diversify in healthcare, international and professional education.

148.    The April 24, 2014 press release was attached as an exhibit to a Form 8-K filed with the SEC on the following day, which was signed by defendant Unzicker.

149.    On May 5, 2014, Defendants caused the Company to file its Form 10-Q with the SEC for the 3Q 2014 for the quarter ended March 31, 2014 ("3Q 2014 Form 10-Q"), which was signed by defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in the Company's April 24, 2014 press release, stating "[t]otal consolidated revenues for the third quarter of fiscal year 2014 of $496.1 million decreased $7.7 million, or 1.5%, as compared to the year-ago quarter.  For the first nine months of fiscal 2014, total consolidated revenues decreased $46.1 million or 3.1% to $1,438.3 million."

150.    With regard to student enrollment, the 3Q 2014 Form 10-Q emphasized that:

Management believes the decreases in enrollments were due to lower demand from DeVry University's target student segment driven by negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. In addition, management believes heightened competition from both public-sector and private-sector education providers contributed to the decreases in DeVry University undergraduate

and graduate enrollments. To improve performance at DeVry University, management continues to execute a turnaround plan which includes:

· Stabilizing enrollments and positioning the university for long-term growth;

· Reducing DeVry University's cost structure, while maintaining and enhancing our service to students;

· Regaining DeVry University's technology edge; and

· Developing and supporting the team to execute the strategy.

* * *

The plan to stabilize enrollments and position DeVry University for long-term growth includes communication of DeVry University's value proposition, which is educational quality, career prospects and high levels of student services.

151.    On the following day, May 6, 2014, in response to an analyst's questions about academic outcomes at the Robert W. Baird & Co. Inc. Growth Stock Conference, defendant Wiggins stated:

So the profile of students at DeVry are what I call nontraditional students, by and large. You know, it's not everybody, but DeVry really excels at students that have had some academic challenge along the way, need additional service or support or care. We're proud of the students that persist and we'll talk a bit about that in a second.

Our graduation rate's in the 30% range. We'd like to see that higher and we're working hard. But the students that persist, our graduate employment data is that over 90% of students actively seeking jobs have them within six months and the average pay of those folks is $44,000, give or take. So the students that come and persist do well. We see good results inside the four walls of the schools. Our net promoter score is very high with our students.

We like the graduate employment.

We'd like to see more of the students persist. So certainly the students that come -- and many of our students are first-time college goers, first in their family or in their generation. Our students tend to have less economic means, which means they borrow more. So it's important that students complete their program.

152.   On June 11, 2014, defendant Hamburger participated in and presented at the William Blair & Company LLC Growth Stock Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So that's who we are. And what's the investment thesis on DeVry Group? It's a clear and powerful formula: quality plus diversification plus long-term thinking, long-term approach. That is what drives long-term growth. And when we talk about quality, the key measure is successful student academic outcomes.
>
> Let me share three recent examples of quality across our institutions. At DeVry University, more than 90% of our graduates in the active job market were employed in their field of study within six months of graduation, and these graduates earned average salary of $44,000. So that's that [90% $44,000] statistic.
>
> In strong and weak job markets, employers value DeVry University graduates.

153.   On July 18, 2014, Defendants caused the Company to announce that it had received a letter from the Office of the Attorney General of the State of New York ("NYOAG") on July 15, 2014, requesting cooperation with the NYOAG's inquiry into whether recent television advertisements and website marketing regarding DeVry University had violated federal and state laws prohibiting false advertising and deceptive practices.   The letter requested information from January 1, 2011 to the present. Defendants caused the Company to state at the time that it intended to cooperate with the investigation, but that it could not predict its outcome.

154.   On August 7, 2014, Defendants caused the Company to issue a press release announcing financial results for 4Q and full-year 2014, ended June 30, 2014.  In that press release, the Company announced quarterly revenues of $485.1 million (a 1% increase from the prior year quarter) and earnings per share of $0.58 (a $1.09 increase

from the prior year quarter). For Fiscal 2014, the Company also announced revenues of $1,923 million (a 2.1% decrease from the prior year) and earnings per share of $2.07 (a 25.5% increase from the prior year). Regarding undergraduate student enrollment for the DeVry University May 2014 session, the press release announced 4,388 new students (a 4.9% decrease from the prior year) and 41,977 total students (a 14.1% decrease from the prior year). For DeVry University's July 2014 undergraduate session, the Company announced 4,915 new students (a 13.4% decrease from the prior year) and 37,210 total students (a 12.2% decrease from the prior year).

155. In a section titled "Graduate Employment Statistics," Defendants noted in the August 7, 2014 press release that for DeVry University undergraduates, 90.9% were employed earning an average salary of $44,295. As in previous announcements of employment statistics, Defendants qualified those statistics by noting that the figures were based on graduates' "self-reported data to DeVry University Career Services who were employed at graduation or who were actively seeking employment after graduation and found employment in their field within six months." In addition, Defendants stated that the figures did "not include graduates who were not actively seeking employment, as determined by DeVry University Career Services, or who did not report data on employment status to DeVry University Career Services." The August 7, 2014 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

156. On the same day, Defendants held a 4Q 2014 Earnings Conference Call. Participating on the call were defendants Hamburger, Unzicker and Wiggins. In his opening presentation, defendant Hamburger touted DeVry University graduate

employment statistics, emphasizing the value of a DeVry University degree after graduation and the value employers attach to it.  Defendant Hamburger, emphasizing the student outcome statistics, noted that: One of our strongest messages is the value employers attach to a DeVry University education, as they consistently hire our graduates to fill their jobs and send their existing employees to us for continuing education.  We announced the latest graduate employment results in today's release and they remained above our goal of 90%.  Actually 90.9% of our graduates in the active job market were employed in their field of study within 6 months of graduation.  And they're earning an average of about $44,300 annually.

157.    On August 27, 2014, Defendants caused DeVry to release its 2014 Annual Report (the "2014 AR") and filed with the SEC the Company's 2014 Form 10-K (the "2014 10-K").  The 2014 10-K was signed by defendants Hamburger, Wiggins, Taylor, Begley, Brown, Logan, Merten, Wardell, and Ruiz. In the 2014 Letter to Shareholders, Defendants boasted that:

> [i]n 2013, 90% of DeVry University graduates actively seeking employment obtained careers in their field of study within six months of graduation or were already employed in their field when they graduated. These graduates earned an average salary of nearly $44,295. In strong job markets and weaker ones alike, employers value DeVry University graduates.

*          *          *



158.    The 2014 10-K reported a decrease of 2% in revenues ($1,923,371,000 for

2014 compared to $1,964,375,000 in 2013), a decrease of 20% in net income ($134,032,000 for 2014 compared to $106,786,000 for 2013) and a decrease of 20% in earnings per share ($2.07 for 2014 compared to $1.65 for 2013).

159.    Within the discussion of "The Vital Role of Private-Sector Education" in the 2014 AR, Defendants noted the following with respect to the success of its graduates:

> Increasingly, students and taxpayer are expecting colleges to prepare student for employment and careers. In 2013, 90 percent of DeVry University graduates actively seeking employment had careers in their fields within six months of graduation, at an average compensation of $44,000. In addition, a study conducted by the Cicero Group found that graduates of DeVry Group institutions experienced significant growth in their earnings.

160.    The 2014 10-K noted, in addition to the decrease in revenue, net income and earnings per share, under the heading "Enrollment Trends" for DeVry University, the Company reported the decrease in new student enrollment:

> New student undergraduate enrollment in the July 2014 session decreased 13.4% to 4,915 students as compared to the prior year.
>
> Total undergraduate enrollment in July 2014 was 37,210 students, a decrease of 12.2% compared to 42,374 in the previous summer.
>
> There were 11,467 total students for the July 2014 session in DeVry University's graduate programs, including its Keller Graduate School of Management, representing a decrease of 13.7% from the prior year. Management believes the decreases in enrollments are due to lower demand from DeVry University's target student segment. This is driven by the prolonged low level of economic growth, persistent higher levels of unemployment, negative perceptions of the value of a college degree and increased reluctance to take on debt. These factors have resulted in a reduction in interest from potential students. In addition, management believes heightened competition from both public-sector and private-sector education providers contributed to the decreases in DeVry University undergraduate and graduate enrollments.

161.    Defendants recognized that the Company's financial success (and that of its graduates) depended on the employment of its graduates.  Thus, the 2014 10-K stated

with respect to DeVry University:

> DeVry University believes that the employment of its graduates is essential to the achievement of its mission and its ability to attract and retain students. Career Services professionals across the DeVry University system work diligently to partner with graduates to attain positions in their career fields. Although DeVry University cannot guarantee employment, it is dedicated to helping guide and motivate its students and graduates through the career process.

> In 2013, 90.9% of graduates of DeVry University's associate and bachelor's degree programs who were actively seeking employment had careers in their chosen fields within six months of graduation at an average salary of $44,295. To a large extent, these figures are based upon self-reported data from graduates.

> They reflect graduates who were employed in positions relating to their field of study within 180 days of graduation from among those graduates who were eligible for career assistance and who actively pursued employment relating to their field of study.

162.   With respect to its marketing, the 2014 10-K noted that:

> DeVry University advertises on various Internet sites, on television and radio and utilizes telemarketing and direct mail to reach prospective students. DeVry University is updating its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education. DeVry University's highly integrated brand initiative focuses on the university's graduate employment success, while emphasizing DeVry University as an accredited, highly respected academic institution. Its campaigns are grounded in ongoing in-depth consumer marketplace research, and leverage multiple channels, including broadcast, print and Internet advertising, public relations, content marketing and social media, as well as local marketing efforts.

163.   In addition, the 2014 10-K again disclosed that on January 28, 2014, DeVry had received a CID for information from the FTC relating to advertising, marketing or sale of secondary or postsecondary education products or services, or education accreditation products or services.  The 2014 10-K noted that "[t]he stated nature and scope of the CID was to determine whether unnamed persons and/or entities have violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as

amended and, if so, whether further FTC action would be in the public interest."

164.    On September 18, 2014, defendant Hamburger participated in and presented at the BMO Back to School Education Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics.  For example, in response to questions from a securities analyst about the value proposition of higher education, he stated:

> And in terms of value proposition and brand, DeVry University has a very strong brand. That's one of the anchors on which we are basing our turnaround and transformation process.
>
> And a very strong value proposition. And that value proposition at DeVry University centers around two concepts: careers and care.
>
> So careers and care. Careers, that's one of our strongest messages.
>
> We just announced the latest graduate employment statistics, as we do every August, and we remained above 90%. Actually, it was 90.9% of our graduates actively seeking employment were employed in their field of study within six months of graduation.
>
> And those figures include students with careers prior to graduation. So, careers.
>
> *       *       *
>
> So the value proposition of DeVry University is very clear, it's very strong and it's around careers and care.
>
> *       *       *
>
> And we've published the results of those career statistics long before it was cool, long before the administration thought it was a good idea. And we think it's a good idea, too. That's why for 30 or 40 years we have published our statistics very consistently, transparency; by program, by market. You as a prospective student or a family can get that information and see what those outcomes are.

165.    On October 8, 2014, Defendants caused the Company to file with the SEC on Form DEF 14A and disseminated to shareholder a Proxy Statement (the "2014

Proxy").   Among other things, the 2014 Proxy described director responsibilities, the duties of each committee, Board risk management, provided information about the director nominees up for election, and sought an advisory vote on the compensation for the company's named executive officers.   In addition, the 2014 Proxy explicitly referenced the Code.

166.   On October 23, 2014, Defendants caused the Company to issue a press release announcing financial results for 1Q 2015, ended September 30, 2014.   In that press release, Defendants announced quarterly revenues of $462.0 million (a 2.5% increase from the prior year quarter) and earnings per share of $0.31 (a $0.42 increase from the prior year quarter).   With regard to undergraduate student enrollment for the DeVry University September 2014 session, the press release announced 5,268 new students (a 20% decrease from the prior year) and 39,857 total students (a 15.1% decrease from the prior year).

167.   Defendant Hamburger stated in the October 23, 2014 press release that "DeVry Education Group's strategy of quality plus diversification plus long-term focus continues to differentiate us and position us well for growth opportunities."   Moreover, the Company stated that DeVry University continued to execute its plan of "enhancing the institution's programmatic focus, optimizing its pricing structure, enhancing its marketing and recruiting efforts, and reducing the cost structure of the organization." The October 23, 2014 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

168.   On November 5, 2014, Defendants caused the Company to file its Form 10-Q with the SEC for 1Q 2015, ended September 30, 2014 ("1Q 2015 Form 10-Q"),

which was signed by defendants Wiggins and Unzicker.   The 1Q 2015 Form 10-Q reiterated DeVry's previously reported financial results in its April 23, 2014 press release, stating "[t]otal consolidated revenues for the first quarter of fiscal year 2015 of $462.0 million increased $11.1 million, or 2.5%, as compared to the year-ago quarter.

169.    With regard to student enrollment, the 1Q 2015 Form 10-Q emphasized that:

> Management believes the decreases in enrollment have been due to lower demand from DeVry University's target student segment believed to be driven by heightened competition from both public-sector and private-sector education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. To improve performance at DeVry University, management continues to execute a turnaround and transformation plan which includes:
>
> · Attracting the right students into strong programs;
>
> · Reducing DeVry University's cost structure, while striving to maintain and even enhance our service to students;
>
> · Regaining DeVry University's technology edge; and
>
> · Developing and supporting the team to drive execution.

170.    On November 12, 2014, defendant Wiggins participated in and presented at the J.P. Morgan Ultimate Services Investor Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So that's kind of a quick review of who we are. What's the strategy for DeVry Group? Well, the good news is it's a clear and powerful formula. Quality, plus diversification, plus long-term focus equals growth.
>
> *       *       *
>
> Let me talk about quality. One of the key measures of quality is successful student outcomes and I'd like to recite or give you three examples. At DeVry University, more than 90% of graduates active in the job market were employed in their field of study within six months of graduation.

74

And the average compensation of these graduates was nearly $44,000. In strong and weak job markets, employers value DeVry University grads.

171.    In response to an analyst's questions about the types of students enrolling at DeVry University, defendant Wiggins provided:

And that's why we feel good about our statistic of over 90% of our students that persist find work in their field of study. So I think what we find is many students are -- don't have money. They're concerned about going into debt. They read the stories – and maybe there's some generational things going on as well.

\*        \*        \*

So when you're trying to attract students at a big institution like DeVry University, they run the gamut from people that are employed, want to seek a master's degree, getting help from their employer, so they have a job, they'll have a job when they're done, to people -- maybe a single mother that's currently unemployed and hasn't been to school in a number of years. Those are profoundly different audiences and that's why I'm so confident that the programmatic focus gives us an opportunity.

172.    On February 5, 2015, Defendants caused the Company to issue a press release announcing financial results for 2Q 2015, ended December 31, 2014.  In that press release, Defendants announced quarterly revenues of $484.9 million (a 1.3% decrease from the prior year quarter) and earnings per share of $0.65 (a 12% decrease from the prior year quarter).  For the six-month period ended December 31, 2014, Defendants also announced revenues of $946.9 million (a 0.5% increase from the prior year period) and earnings per share of $0.96 (a 52% increase from the prior year period). Regarding undergraduate student enrollment for the DeVry University November 2014 session, the press release announced 4,201 new students (a 12.9% decrease from the prior year) and 38,235 total students (a 12.6% decrease from the prior year).  For DeVry University's January 2015 undergraduate session, the Company announced 4,282 new students (a 12.8% decrease from the prior year) and 37,922 total students (a 15.9%

decrease from the prior year).

173.    Defendants repeated the claim that DeVry University continued to execute its plan of "enhancing the institution's programmatic focus, better communicating its value proposition to students and employers, and reducing its cost structure through workforce reductions and real estate consolidations."  The February 5, 2015 press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

174.    On the same day, Defendants caused the Company to file its Form 10-Q with the SEC for the 2Q 2015 for the quarter ended December 31, 2014 ("2Q 2015 Form 10-Q"), which was signed by defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results reported in the Company's February 5, 2015 press release, stating "[t]otal consolidated revenues for the second quarter of fiscal year 2015 of $489.9 million decreased $6.4 million, or 1.3%, as compared to the year-ago quarter.  For the first six months of fiscal year 2015, total consolidated revenues increased $4.7 million or 0.5% to $946.9 million, as compared to the year-ago period."

175.    With regard to student enrollment, the 2Q 2015 Form 10-Q emphasized that:

> Management believes the decreases in enrollment have been due to lower demand from DeVry University's target student segment driven by heightened competition from both public-sector and private-sector education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. To improve performance at DeVry University, management continues to execute a turnaround and transformation plan which includes:
>
> · Attracting the right students into strong programs;
>
> · Reducing DeVry University's cost structure, while striving to maintain

and even enhance its service to students;

· Regaining DeVry University's technology edge; and

· Developing and supporting the team to drive execution.

176.   On March 20, 2015, Defendants caused DeVry University to release its 2013-2014 Academic Annual Report stressing that "[o]ne critical measure of our success is the employment outcomes of DeVry University graduates."  To that effect, Defendants indicated that, "[i]n 2013, 90% of DeVry University graduates actively seeking employment had careers in their field of study within 6 months of graduation at an average salary of $44,295."

177.   Contrary to Defendants' representations concerning the Company's prospects for continued growth, Defendants were well aware from that under their direction and on their watch, DeVry was facing formidable hurdles stemming from the lackluster employment prospects of DeVry University graduates.  By purposefully misrepresenting the employment prospects of DeVry University graduates to shareholders and potential students, Defendants were able to hide the Company's true financial state.

178.   On April 23, 2015, Defendants caused the Company to issue a press release announcing financial results for 3Q 2015, ended March 31, 2015.  In that press release, Defendants announced quarterly revenues of $489.8 million (a 1.3% decrease from the prior year quarter) and earnings per share of $0.72 (a 16% decrease from the prior year quarter).  For the nine-month period ended March 31, 2015, Defendants also announced revenues of $1,436.8 million (a 1.3% decrease from the prior year period) and earnings per share of $1.68 (a 12.8% increase from the prior year period).  Regarding

undergraduate student enrollment for the DeVry University March 2015 session, the press release announced 4,156 new students (a 17.2% decrease from the prior year) and 36,188 total students (a 15% decrease from the prior year).

179.    Defendant Hamburger also introduced in the April 23, 2015 press release a marketing initiative that, despite being characterized as a new branding effort, was designed to continue attracting students in the face of formidable competition and a weakened economy with the same employment-outcome focus that Defendants had previously been touting. In other words, DeVry's new strategy to differentiate itself from its competitors was the same as its old one:

> Today we have announced the next phase of the significant transformation strategy underway at DeVry University to improve its competitive positioning and return the institution to growth. We are confident that this strategy, together with the sustained expansion of our healthcare, professional and international institutions will drive positive student outcomes and DeVry Group's future growth.

180.    Along those same lines, Defendants caused the Company to state:

> DeVry University announced the next phase of its strategy to return to growth and transform the institution through new, student-focused innovations. Near-term, the university is taking action to differentially invest in its strongest markets and programs; reduce its cost structure; and establish a distinct voice for its brand. In addition, DeVry University is implementing strategies to place it on a path for growth by enhancing the teaching and learning model, addressing affordability, and strengthening employer workforce solutions. Taken together, these actions are designed to maintain positive economics in fiscal 2016.

> DeVry University recently relaunched its brand to emphasize what it is best known for, careers and care. To view the campaign, which illustrates how DeVry University is "Different. On Purpose" please click on this web link: http://bit.ly/1EdBznH.

181.    The April 23, 2015 press release was attached as an exhibit to a Form 8-K filed with the SEC on the following day, which was signed by defendant Unzicker.

182.    On the same day, the Company announced that it had received from the Office of the United States Attorney for the Northern District of Ohio compulsory requests for documents and information from 2007 through April 1, 2015.  Defendants caused the Company to state that the "requests address allegations under the False Claims Act that DeVry University offered an associate degree program in Health Information Technology without providing necessary information to applicants regarding requirements for obtaining a degree and a job in the health information technology field upon graduation."  Defendants further claimed that they could not predict the outcome of that investigation.

183.    On April 23, 2015, Defendants held a 3Q 2015 Earnings Conference Call. Participating on the call were defendants Hamburger, Unzicker, and Wiggins.  In his opening presentation, defendant Hamburger discussed the relaunch of DeVry University's brand as part of its strategy of quality, plus diversification, plus long-term focus to differentiate it from other schools.  With respect to its communication campaign emphasizing "career outcomes" and how that is a contributing factor in attracting students to DeVry University which affects revenue of the Company, defendant Hamburger noted the following:

> And third, we relaunched the DeVry University brand. Our new communications campaign emphasizes how DeVry University is different on purpose. . . . We're emphasizing what DeVry University is known for, which is careers and care. Students give us a great deal of credit for our ability to deliver strong career outcomes and for the care and support we provide them to help them achieve these outcomes. The new messaging is designed to clearly establish a distinct voice for the brand and to instill pride in the students we serve. Taken together, these and other near-term actions are designed to maintain positive economics in fiscal 2016.

184.    On May 5, 2015 defendant Hamburger participated in and presented at the

Robert W. Baird & Co. Inc.'s Growth Stock Conference wherein he again discussed the success of DeVry and in particular DeVry University graduates' employment statistics:

> So the employment statistics of the graduates at DeVry University -- I'm assuming you're talking about DeVry University because you can speak to the other institutions as well -- and they all have good employment results. DeVry University's employment results are actually trending up. That's one of the reasons that we're very confident in the ability, among many other reasons, in the ability that we have to improve our results and to turn it around, is the fundamental value proposition which is, I think, what your question gets at, for the student is very strong, in fact strengthening. Employment results are up. Salaries are up as well for the graduates. So the percentage who are employed in fields of study within six months of graduation or in the active job market is up, and their salaries are going up. The employers are very happy with our graduates, and so the Cisco's and the IBMs and the GEs and the Accentures, you know, they're coming back again and again for our graduates.

> The value proposition in terms of return on that educational investment that you asked about I think is also very good because the salaries are going up. . . .

185.    On May 8, 2015, Defendants caused the Company to file its Form 10-Q with the SEC for the 3Q 2015 for the quarter ended March 31, 2015 ("3Q 2015 Form 10-Q"), which was signed by defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results reported in the Company's April 23, 2015 press release, stating "[t]otal consolidated revenues for the third quarter of fiscal year 2015 of $489.8 million decreased $6.3 million, or 1.3%, as compared to the year-ago quarter. For the first nine months of fiscal year 2015, total consolidated revenues decreased $1.5 million or 0.1% to $1,436.8 million, as compared to the year-ago period."

186.    With regard to student enrollment, the 3Q 2015 Form 10-Q emphasized that:

> Management believes the decreases in enrollment have been due to lower demand from DeVry University's target student segment driven by heightened competition from both public-sector and private-sector

education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. To address the issue of declining enrollment, DeVry University is focused on implementing management's transformation strategy which includes both, near-term actions to improve enrollment, and longer-term investments to increase competitiveness and differentiation.

187.   On August 18, 2015, Defendants caused the Company to issue a press release announcing financial results for 4Q and full-year 2015, ended June 30, 2015.  In that press release, the Company announced quarterly revenues of $473.2 million (a 2.5% decrease from the prior year quarter) and earnings per share of $0.46 (a 20% decrease from the prior year quarter).  For the entire 2015 fiscal year, Defendants also announced revenues of $1,909.9 million (a 0.7% decrease from the prior year) and earnings per share of $2.14 (a 3% increase from the prior year).  With regard to undergraduate student enrollment for the DeVry University May 2015 session, the press release announced 3,817 new students (a 13% decrease from the prior year) and 34,524 total students (a 17.8% decrease from the prior year).  That press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

188.   On the same day, Defendants held a 4Q 2015 Earnings Conference Call. Participating on the call were defendants Hamburger, Unzicker and Wiggins.  In his opening presentation, defendant Hamburger discussed the relaunch of DeVry University's brand which was already having a positive effect.  With respect to its communication campaign emphasizing "career outcomes" and how that is a contributing factor in attracting students to DeVry University which affects revenue of the Company, defendant Hamburger noted the following:

> And we've relaunched the DeVry University brand. Our new communications campaign emphasizes how DeVry is Different.

On Purpose. We're emphasizing what DeVry University is known for, which is careers and care. Several of the investors I've spoken with have commented on our Different. On Purpose campaign.

While it was just launched in July, we're seeing very early signs of success. For the last couple of years, we've seen brand awareness indicators flipping but with the launch of this campaign, we've now seen an uptick in both brand recognition and memorability.

So, we're encouraged by the early results of the combination of our programmatic and local focus supported by our strong brand.

189.    On August 27, 2015, Defendants caused DeVry to release its 2015 Annual Report ("2015 AR") and filed with the SEC its Form 10-K ("2015 10-K") for the fiscal year ended June 30, 2015, reiterating DeVry's previously reported financial results reported in the Company's August 18, 2015 press release.  The 2015 10-K was signed by defendants Hamburger, Wiggins, Unzicker, Begley, Brown, Logan, Merten, Ruiz, Taylor, Wardell and White.  Defendants reported a decrease of 0.7% in revenues ($1,909,943,000 for 2015 compared to $1,923,371,000 in 2014), an increase of 4% in net income ($139,899,000 for 2015 compared to $134,032,000 for 20143) and an increase of 3% in earnings per share ($2.14 for 2015 compared to $2.07 for 2014).

190.    In his Letter to Our Shareholders, defendant Hamburger boasted the "foundation of [the Company's] success" stating that:

Quality means delivering career-focused education with strong outcomes for students-ensuring that they are learning, graduating, gaining employment in their fields of study and paying back their loans. It gives us a competitive advantage, because students want to attend schools with proven high-quality outcomes.

*        *        *

Our success not only strengthen our position, but also differentiates DeVry Group institutions from others that are struggling- an important consideration for students who are being careful about where they make

their investments in higher education. In our view, quality leads to growth; Investing in quality academic produces successful students, making our institutions more attractive to prospective students, enabling us to grow, and generating the resources to invest back into further quality and growth initiatives.

191.   Noticeably absent from the Letter to Shareholders was any discussion of

the employment and career statistics which appeared in each of the prior year's Letters.

192.   The 2015 10-K noted, in addition to a decrease in revenue, and increases

in both net income and earnings per share, under the heading "Enrollment Trends" for

DeVry University, the Company reported a decrease in new student enrollment:

New student undergraduate enrollment in the July 2015 session decreased 18.6% to 4,000 students as compared to the prior year.

Total undergraduate enrollment in July 2015 was 31,293 students, a decrease of 15.9% compared to 37,210 in the previous summer.

There were 10,045 total students for the July 2015 session in DeVry University's graduate programs, including its Keller Graduate School of Management, representing a decrease of 12.4% from the prior fiscal year. Management believes the decreases in undergraduate and graduate enrollment have been due to lower demand from DeVry University's target student segment driven by heightened competition from both public-sector and private-sector education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students.

193.   With respect to its marketing efforts, the 2015 10-K noted that:

DeVry University advertises on various internet sites, on television and radio and utilizes a variety of methods to reach prospective students. DeVry University is updating its marketing programs in order to better communicate the quality of its degree programs and the value of a DeVry University education. DeVry University's highly integrated brand initiative focuses on DeVry University as an accredited, respected academic institution. Its campaigns are grounded in ongoing in-depth consumer marketplace research, and leverage multiple channels, including broadcast, print and internet advertising, public relations, content marketing and social media, as well as local marketing efforts. In order to position DeVry University for growth, local marketing and advertising

will be increased significantly in targeted markets.

194.    On September 2, 2015, Defendants filed a Form 8-K with the SEC disclosing that the Company had received from the Multi-Regional and Foreign School Participation Division of the Federal Student Aid office of the Department of Education a request for "documents and information regarding published employment outcomes and earnings of DeVry University graduates."   According to Defendants, that request was intended "to permit [the DoE] to assess DeVry University's compliance with applicable regulations under Title IV[.]"   The Company stated that it would cooperate with the request, but could not predict the outcome of the investigation.   That 8-K was signed by defendant Unzicker.

195.    On September 10, 2015, defendant Hamburger participated in and presented at the BMO Capital Markets Back to School Education Conference where, in response to a question about DeVry University's outcomes, he stated:

> Outcomes, we've done a lot. The big outcomes that we look at are (inaudible) learning, are they persisting graduating? Are they gaining employment in their field? Are they repaying their loans?
>
> Those are all the kinds of outcomes, that I think are important, and I think all colleges should be held accountable to.

196.    On October 22, 2015, Defendants caused the Company to issue a press release announcing financial results for 1Q 2016, ended September 30, 2016.   In that press release, Defendants announced quarterly revenues of $441.4 million (a 4.5% decrease from the prior year quarter) and earnings per share of $0.08 (a 74.2% decrease from the prior year quarter).   With regard to undergraduate student enrollment for the DeVry University September 2015 session, the press release announced 4,006 new students (a 24% decrease from the prior year) and 31,843 total students (a 20.1%

decrease from the prior year).  That press release was attached as an exhibit to a Form 8-K filed with the SEC on the same day, which was signed by defendant Unzicker.

197.    On October 2, 2015, Defendants caused the Company to file with the SEC on Form DEF 14A and disseminated to shareholders a Proxy Statement (the "2015 Proxy").    The 2015 Proxy described director responsibilities, the duties of each committee, Board risk management, provided information about the director nominees up for election, and sought an advisory vote on the compensation for the company's named executive officers.  In addition, the 2015 Proxy explicitly referenced the Code.

198.    Defendants' statements referenced throughout including the 2014 Proxy and 2015 Proxy were materially false and misleading because: (1) under Defendants' direction and on their watch, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) DeVry University's job placement claims (caused to be made by Defendants) were only made possible by the use of waivers and opt-outs from its career services department; (4) due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) Defendants were unable to substantiate the truthfulness of their statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide

in the active job market held positions in their fields of study within 6 months of graduation"; (6) a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) DeVry University's own data contradicted Defendants' claims that DeVry University's bachelor's degree graduates earn 15% more than graduates from other schools; and (8) DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

199.   On November 4, 2015, Defendants caused the Company to file its Form 10-Q with the SEC for the 1Q 2016 for the quarter ended September 30, 2015 ("1Q 2016 Form 10-Q"), which was signed by defendants Wiggins and Unzicker, reiterating DeVry's previously reported financial results in the Company's October 22, 2015 press release, stating "[t]otal consolidated revenues for the first quarter of fiscal year 2016 of $441.4 million decreased $30.6 million, or 4.5%, as compared to the year-ago quarter."

200.   With regard to student enrollment, the 1Q 2016 Form 10-Q emphasized that:

> Management believes the decreases in undergraduate and graduate enrollment have been due to lower demand from DeVry University's target student segment driven by heightened competition from both public-sector and private-sector education providers, the availability of lower cost degrees, negative perceptions of the value of a college degree and increased reluctance to take on debt, resulting in a reduction in interest from potential students. Management believes heightened competition at the local level has increased, as local colleges have started targeting adult students to a much greater extent, also local public-sector and independent colleges are taking share from national competitors. Pricing pressure is increasing, and while students appear willing to pay a high price for private independent colleges, DeVry University is more expensive than many of its public and private-sector competitors.

> To address the issue of declining enrollment, DeVry University is focused on implementing management's transformation strategy which includes

both near-term actions to stabilize enrollments and sustain positive economics and loner-term investments to increase competitiveness and differentiation.

201.    Defendants' statements referenced herein were materially false and misleading because: (1) under Defendants' direction and on their watch, the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) DeVry University's job placement claims (caused to be made by Defendants) were only made possible by the use of waivers and opt-outs from its career services department; (4) due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) Defendants were unable to substantiate the truthfulness of their statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) DeVry University's own data contradicted Defendants' claims that DeVry University's bachelor's degree graduates earn 15% more than graduates from other schools; and (8) DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.

C.     **The Truth Begins to Emerge**

202.   On January 27, 2016, the FTC initiated the FTC Action by filing a suit against DeVry for engaging in deceptive practices by purposefully misrepresenting the benefits of obtaining a degree from DeVry University.  According to the FTC Action, DeVry falsely touted that: (1) 90% of DeVry University students from a specific year (*e.g.*, graduates from 2011-2016) who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; (2) 90% of DeVry University students since 1975 who were actively seeking employment did not in fact land or obtain new jobs in their field of study within six months of graduation; and (3) one year after graduation, the average or median salary of DeVry University graduates with bachelor's degrees was not in fact 15% higher than the average or median salary of graduates with bachelor's degrees from all other colleges and universities.  In truth, the actual number of DeVry University graduates who found employment in their field of study within six months of graduating was "significantly smaller than 90%."

203.   This undoubtedly occurred under Defendants' direction and on their watch.  Similarly, the FTC stressed that DeVry University's own files belied Defendants' assertion that DeVry University's graduates earn significantly higher salaries than graduates from other colleges or universities.

204.   Next, the DoE publicly issued to DeVry a Notice of Intent to Limit, which explained the DoE's intention to impose limitations on DeVry's participation in programs authorized under Title IV and prevent the Company from making certain statements in advertising its schools.  The DoE specifically stated that the Company was unable to substantiate its repeated advertisement that since 1975, 90% of DeVry graduates were

employed in their field of study within six months of graduation because the Company did not maintain the necessary graduate-by-graduate records to substantiate that claim. Instead, as explained by the DoE, the Company used summary reports for certain years containing employment results of each graduating class.  The DoE found, however, that those reports did not substantiate DeVry's advertisements because the reports themselves could not be verified without graduate-specific data.  The DoE therefore concluded that DeVry was unable substantiate its claim that since 1975, 90% of DeVry graduates were employed in their field of study within six months of graduation.

205.    These actions by the FTC and DoE prompted Defendants to issue a press release on January 27, 2016 denying the allegations.

206.    The FTC Action highlights that Defendants have falsely "advertised and promoted [DeVry University's] degree programs through television commercials, [DeVry University's] website, YouTube advertisements, radio spots, print advertisements, Facebook, Twitter, sales pitches with prospective students, and other advertising and promotional materials."   Through these means, DeVry (under Defendants' direction and on their watch) made material misrepresentations.  The FTC Action sets forth:

> ***[A]s a result of obtaining a DVU degree, 90% of DVU graduates who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation.*** In some instances when Defendants make this representation, they claim this statistic applies to DVU graduates from a recent year, while in other instances, Defendants claim this statistic applies to all graduates since 1975, or "for more than 30 years." In its advertising and in its presentations to prospective students, Defendants present this 90% "employment rate" as evidence of the likelihood that obtaining a DeVry degree leads to finding a job. While Defendants' advertisements and sales pitches most commonly express DVU's employment rate for recent graduates as exactly 90%, in some instances, during certain limited time periods, Defendants have stated a

percentage that is slightly less or more than 90% (e.g., 87% or 92%). *As explained below, these representations (Defendants' "90% claims") are false and unsubstantiated.*

207.   As noted by the FTC, DeVry has been advertising its 90% employment and higher income claims on various webpages on the DVU website (www.devry.edu) since at least 2008.  Some examples include:

**Excellent employment results**
Nobody wants to go to college and just be a number…unless they're numbers like these. Each year, thousands of our grads find themselves right where they want to be – employed in their fields of study.



**An education that pays**
Not only can a degree from DeVry University prepare you for a lifetime of career success, it can also increase your earning potential right from the start.



208.   In order to substantiate the 90% claim, Defendants relied upon student records maintained by DeVry University's Career Services department.  These student records contain information about students' majors, graduation dates, employment history, and DeVry University's classification of their employment status.  According to

the FTC:

> [t]hese student records, however, do not provide a reasonable basis that substantiates Defendants' 90% claims. Among other reasons, when calculating the 90% claims, Defendants count a substantial number of DVU graduates who should not be counted and similarly exclude a substantial number of DVU graduates who should not be excluded. For example, Defendants count graduates who did not obtain a job as a result of obtaining a degree from DVU.

209.    In fact, Defendants included the substantial percentage of DVU graduates who, after graduation, continued with the same job they had when they enrolled in DVU. Defendants also counted graduates who did not obtain jobs in their field of study.   A significant percentage of the jobs that Defendants counted as being in the graduate's field of study include jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study.

210.    Several examples of DeVry University students from the graduating class of 2012 who were incorrectly classified as working "in field" include (but are not limited to):

a.      graduates with degrees in technical management who were working as: a rural mail carrier (human resources specialization); a yard salesman at a nursery (business information systems specialization); a sales associate at Macy's (general technical specialization); a driver delivering rain gutters for a construction services company; a data entry specialist for a radio station (human resources specialization); and unpaid volunteers at medical centers (human resources management and health services management specializations);

b.      a graduate with a degree in business administration (health services management specialization) working as a server at the Cheesecake Factory;

c.      a graduate with a degree in business administration (health care management specialization) working as a car salesman;

d.      a graduate with a degree in business administration (accounting specialization) working as a secretary at a prison; and

e.     graduates   with   various   degrees   working   as   customer   service representatives.

211.   Additionally, the FTC asserted that Defendants relied on an income report prepared by a third-party to substantiate their claims that DeVry University graduates obtained higher incomes.   However, according to the FTC, this income report lacked a reasonable basis to substantiate Defendants' claim, as "[t]he sampling methods and methodology of the survey that underlay the income report all gave or should have given Defendants reason to question the reliability of the conclusions and information contained in the report."   Notably, DeVry University personnel voiced their concerns over whether the date contained in the income report sufficiently supported the higher-income claim.   Yet, Defendants willfully ignored these and other red flags.

212.   Due to the manner in which Defendants manipulated this information, the FTC concluded that "[t]he actual percentage of DVU graduates who, at or near the time they   graduated, found jobs that could reasonably be considered 'in their field' is significantly smaller than 90%."

213.   The FTC further emphasized that:

> Among other problems, the comparison of the incomes of DVU graduates with incomes of graduates from other schools did not account or adjust for significant salary drivers such as age, experience, and degree field. In addition, statistics that DVU had directly collected from thousands of its graduates each year about their incomes differed significantly from the third party's statistics, which consisted of information from only several hundred individuals per graduation year.

214.   Furthermore, Defendants had access to publicly available statistics regarding the incomes of graduates from other colleges and universities throughout the United States, by school and by field.   "Comparing the information in Defendants' own

files with publicly available income date shows that DVU graduates a year after graduating do not in fact earn significantly more than graduates from all other schools combined, *casting doubt on Defendants' higher-income claim*."

215.    As stated above, on January 27, 2016, the DoE issued DeVry University a Notice of Intent to Limit DeVry's participation in programs authorized pursuant to Title IV of HEA, after finding that DeVry was in violation of federal law.

216.    According to the DoE, starting in at least 2008 and continuing until at least August 2015, DeVry's marketing and promotional materials represented that:

> "Since 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation."

217.    Concerned with the veracity of Defendants' Since 1975 Representation, the DoE sent a letter to DeVry on August 28, 2015 requesting information about its Since 1975 Representation, particularly the data used to substantiate its 90% employment claim.  As noted by the Department of Education in its Notice of Intent, federal law mandates that educational institutions participating in Title IV programs must be able to provide "the most recent available data concerning employment statistics and…any other information necessary to substantiate the truth of the advertisements," 20 U.S.C. § 1094(a)(8); 34 C.F.R. § 668.14(b)(10).  After attempting to garner additional information from DeVry on several occasions in September and October 2015, the Department of Education concluded that "DeVry is unable to substantiate the truthfulness of those representations, as required by federal law."

218.    With regard to DeVry's representations (which were made under Defendants' direction and on their watch), the DOE's Notice of Intent stated:

As described more fully below, starting in at least 2008 and continuing until at least August 2015, DeVry made representations to students and prospective students regarding the post-graduation employment outcomes of students who graduated from DeVry over a cumulative period stretching more than 30 years. The specific representation that forms the basis of this action was highlighted in DeVry's We Major in Careers campaign, a 2008 "career-focused brand marketing campaign" that sought to position DeVry as an institution that helped its graduates achieve career success. That campaign, which reflected more than a year's worth of in-depth consumer, marketplace, and brand research by DeVry, represented a conscious decision by DeVry to make certain representations to students and prospective students for marketing and recruitment purposes. Yet with respect to certain representations that were made by DeVry as part of that campaign and which continued to be made until at least August 2015, DeVry is unable to substantiate the truthfulness of those representations, as is required by federal law.

219. As a result of Defendants' illicit behavior, the Department of Education imposed numerous conditions on DeVry in order to continue receiving Title IV funds. To that effect, the DoE stated:

Accordingly, as a condition of its continued participation in the Title IV programs and consistent with existing statutory and regulatory requirements, the Department is hereby notifying DeVry that neither it nor its agents or employees may make any representations, in advertisements or otherwise, that include statistics consisting of or based upon the post-graduation employment outcomes of students who graduated during the time that DeVry has conceded it does not possess graduate-specific information, i.e., the type of information that is necessary to substantiate the truthfulness of any post-graduation employment claims. Nor may DeVry make any representations that include or are based upon post-graduation employment statistics regarding other time periods that cannot be substantiated with graduate-specific information. Moreover, for a period of five years following the effective date of this action, DeVry must subject all such representations to review by an independent auditor prior to the utterance (i.e., oral, written, or otherwise) of such representations. The Department is also requiring DeVry to contact third parties who are repeating or re-publishing DeVry's unsubstantiated representations and demand that those entities cease doing so, to retain records used to develop and substantiate certain advertisements, to notify the Department of any legal claims, investigations, subpoenas or other inquiries regarding its post-graduation employment representations, and to notify its students of this limitation. DeVry's failure to comply with these limitations could subject DeVry to further actions pursuant to 34 C.F.R. Part 668, Subpart

G, up to and including termination from its participation in Title IV programs.

220.    As a result of these revelations, DeVry's common stock price dropped 15%, or $3.65 per share, from $23.68 per share on January 26, 2016 to a $20.09 per share closing on January 27, 2016.

221.    Over the next several trading days, DeVry's stock price continued to trade lower, closing at $18.08 per share on February 2, 2016. In total, from January 27, 2016 to February 2, 2016, DeVry's share price dropped $5.66 per share, or 24%.

222.    In an article entitled "DeVry Education Teaches Tough Investment Lesson," investor website *thestreet.com* recommended against owning shares of DeVry in light of the recent revelations.  The article stated the following, in relevant part:

> To offset its declining student population at its various campuses, DeVry has ratcheted its promotional activities and marketing campaigns, claiming that 90% of its graduates who actively sought employment found new jobs in their majors within six months of graduation. Plus, DeVry claims that within a year of graduation, its former students earned 15% more pay compared to other graduates. But these claims are at best deceptive, according to the FTC …With DeVry's earnings and revenue in retreat and with little prospect of higher enrollment, we recommend avoiding DeVry shares. And at around $18 per share, DeVry could see its stock reach single digits as the weight of the government investigation grows more heavy.

223.    In reaction to these troubling disclosures, DeVry's price target was downgraded by a host of investment research firms, as shown in the table below:

| Firm | Old Target Price | New Target Price |
|---|---|---|
| BMO Capital Markets | $30.00 | $21.00 |
| Compass Point | $28.00 | $18.00 |
| Deutsche Bank | $28.00 | $22.00 |
| Morgan Stanley | $33.00 | $27.00 |
| Robert Baird | $29.00 | $20.00 |
| Barrington Research | $35.00 | $25.00 |

224.    Defendants caused DeVry to contest the Notice of Limitation on February

12, 2016, causing the matter to be the subject of a Federal Student Aid proceeding entitled *In the Matter of DeVry University*, Docket No. 16-07-O.

225.    On March 14, 2016, the U.S. Department of Veterans Affairs cautioned GI Bill participants about DeVry on account of the FTC's lawsuit and the Department of Education's Notice of Intent.  In a letter sent to DeVry University, Curtis Coy, the VA Deputy Undersecretary of Economic Opportunity, said: "Effective the date of this letter, VA is suspending DeVry University's status as a [Principles of Excellence] institution at least until the conclusion of the FTC lawsuit," and highlighted that "[t]he FTC findings, [Department of Education] conclusions, and GI Feedback System complaints indicate that DeVry University has not acted in accordance with … Principles of Excellence guidelines."

226.    On May 9, 2016, Judge Michael W. Fitzgerald ("Judge Fitzgerald") of the Central District of California rejected DeVry's request to dismiss the FTC's Action against the Company.  The Court found that the FTC stated a plausible claim for express misrepresentations.  Judge Fitzgerald stated in his motion to dismiss order that the "allegations show that the FTC's claims have factual basis and provide Defendants with adequate notice as to the FTC's reason for believing that the employment statistic is unsubstantiated and materially false."  Regarding DeVry's higher-income advertisement representations, the Court stated that "It takes no special knowledge of statistics to realize that comparing, for example, the incomes of a thirty-five-year old DeVry University graduate with ten years of experience and an average twenty-one-year-old college graduate with no experience could lead to misleading results…these allegations are plausible and particular enough to put Defendants on notice of the FTC's basis for its

claim."

227.    On May 24, 2016, it was announced that defendant Hamburger had "left"

the Company.    A *Chicago Tribune* article from that day entitled "DeVry Education

Group CEO out after federal lawsuit" set forth, in relevant part:

> DeVry Education Group's CEO is out, two months after DeVry University
> was suspended from the Department of Veterans Affairs' Principles of
> Excellence program and four months after the Federal Trade Commission
> filed suit against DeVry, accusing the for-profit college of misleading
> students about job placement success.
>
> Daniel Hamburger — who was paid $5.3 million last year to lead the
> Downers Grove-based company — has been replaced by Lisa Wardell, a
> longtime DeVry board member with a background in private equity.
>
> Hamburger left "to pursue other opportunities," according to a news
> release from DeVry, which did not make Wardell available for an
> interview. School spokesman Ernie Gibble said in an email Tuesday that
> "Daniel's departure has nothing to do with the FTC."
>
> DeVry's stock has lost 56 percent of its value since the start of 2015, as it
> and other for-profit colleges have come under increased federal scrutiny.

228.    Then, on June 2, 2016, it was announced that defendant Wiggins would

"leave" DeVry effective June 30, 2016.    A press release on that day set forth, in relevant

part:

> DeVry Education Group has named Patrick Unzicker senior vice
> president, chief financial officer and treasurer of DeVry Group.
>
> Unzicker was most recently vice president, chief accounting officer and
> treasurer of DeVry Group. He succeeds Timothy Wiggins, who leaves
> DeVry Group June 30 after nearly 5 years as CFO. Wiggins was
> instrumental in DeVry Group's succession planning and mentorship for the
> CFO position.
>
> Unzicker has been with DeVry Group since 2006 and has held roles of
> increasing responsibility during his tenure. In his most recent role, he was
> responsible for DeVry Group's financial planning and analysis,
> accounting, and treasury and insurance risk management functions. He
> also plays an active role in strategy and acquisition activity.

"I have worked closely with Patrick in my previous role as the DeVry Group audit and finance committee chair and I am thrilled to work with him in his new role as CFO," said Lisa Wardell, president and CEO of DeVry Group. "He has developed a strong reputation for his partnership approach to the broader DeVry Group team and will have an important role helping to implement our diversification strategy."

229. On June 7, 2016, the parties in the FTC Action submitted their Joint Rule 26(f) Report with Errata. In the "Discovery Plan" section of the Joint Rule 26(f) Report, the FTC revealed the "evidence on which [it] relies on to support its allegations that [DeVry's and DeVry University's] 90% claim was false and unsubstantiated consists of student files, summaries of graduate placement information, and other documents that [DeVry and DeVry University] produced during [the FTC's] investigation in response to a request for the documents on which Defendants relied to support their claims, as well as other documents [DeVry and DeVry University] produced, such as internal emails and presentations. The FTC confirmed that its "allegation that the 90% claim was false and unsubstantiated consists of an analysis of these documents that [the FTC's] own personnel conducted in preparation for possible litigation." Further, in Section D.3 (Key Documents), the FTC identified the following as key documents:

- The Company's advertisements, including television and radio commercials, websites, brochures, recruitment and enrollment presentations, social media, and brochures promoting DVU, as well as dissemination information;

- DVU student and graduate records used to substantiate [DeVry and DeVry University's] claims, including but not limited to Graduate Registration Forms or eforms, graduate observation logs, and summary spreadsheets;

- Training manuals, and policies and procedures, used by DVU's career services

department and DVU admissions department;

- Audit reports, internal communications about student or graduate employment or about DVU's classification or proposed classification of student or graduate employment, and records concerning contact between students and graduates with DVU's Career Services Department;

- Complaints, and documents generated by [DeVry and DeVry University] in response to complaints, concerning employment issues and representations alleged in the Complaint, as well as consumer injury and mentality;

- [DeVry's and DeVry University's] internal documents discussing recruitment, advertising and marketing, employment statistics (including but not limited to who was or should be counted band who was not or should not be counted), other policies of DVU's career services department, graduate incomes, and the claims at issue in the Complaint, including such documents as emails, memos, spreadsheets, and PowerPoint presentations;

- Documents from third parties such as PayScale that [DeVry and DeVry University] relied on as the bases for the higher income claim;

- Documents from third parties such as the National Association of Colleges and Employers relating to average or median incomes of college graduates;

- Internal communications and communications with third parties such as CompliancePoint or Deloitte & Touche discussing the results of efforts to audit or verify DVU's employment statistics or to obtain information from graduates concerning their employment and income;

- Communications with third parties such as advertising agencies discussing or

relating to messages conveyed by, or intended to be conveyed by, advertisements that referred to DVU's employment statistics or income earned by DVU graduates;

- [DeVry's and DeVry University's] financial information, including revenue figures;

- [DeVry's and DeVry University's] internal copy tests, alumni surveys, and other data related to the 90% and higher-income claims; and

- Third-party copy tests, marketing surveys or reviews and internal communications concerning these copy tests and marketing surveys or reviews.

230.    In sum, as the FTC Action revealed, based on its extensive pre-filing investigation, that throughout the Relevant Period, DeVry and DeVry University conducted a deceptive marketing campaign with inflated job placement and salary numbers in order to lure prospective students or retain those already enrolled at DeVry University, and at the same time assure shareholders and analysts that the Company can remain competitive in its industry even during an economic downturn.  This undoubtedly occurred under Defendants' direction and on their watch.  The bottom-line message of this marketing drive was that if you chose to attend or stay at DeVry University over other for-profit schools, community colleges, and public and private post-secondary institutions, you are more likely to get a job in your field of study within six months of graduation at a higher salary.  The FTC, however, after conducting an extensive, two-year investigation, filed a lawsuit that charged DeVry's employment statistics as false and unsubstantiated because, among other reasons, DeVry and DeVry University counted a substantial number of DeVry University graduates who should not have been counted,

and excluded a substantial number of graduates who should not have been excluded. Moreover, the FTC asserted that Defendants improperly relied on a third-party income report to substantiate their higher income claim, but this report lacked a reasonable basis to support such a claim.

231.    On October 13, 2016, the DoE announced that it had entered into a settlement "resolving the Department's charge that [DeVry] used unsubstantiated job placement claims in recruitment and advertising materials." In the DoE's press release issued that day, the DoE explained that the settlement "enhances the Department's oversight of DeVry and builds upon the Obama Administration's commitment to protecting students, safeguarding taxpayer dollars and increasing accountability among postsecondary institutions." U.S. Secretary of Education John B. King, Jr., also stated in the press release that "[s]tudents deserve accurate information about where to invest their time and money, and the law is simple and clear: recruitment claims must be backed up by hard data." DoE Chief Enforcement Officer Robert Kaye thanked the FTC for its support in its investigation, stating that the DoE and FTC had "put an end to the use of an unsubstantiated claim by this institution." The press release added that the DoE is "working closely" with the FTC in connection with the FTC's lawsuit against DeVry, and that the DoE would "continue to support the FTC's ongoing lawsuit against DeVry, while also continuing its own investigations of the institution."

232.    The DoE Settlement provides that DeVry will participate in Title IV programs under a provisional certification, and requires DeVry to take a number of measures, including:

(a)    "immediately cease publishing or otherwise using the Since 1975

Representation";

(b) cease making "any representations to a student, prospective student, accrediting agency, state agency, the Secretary, or any member of the public that are based, in whole or in part, on the post-graduation employment outcomes of any student who graduated from [DeVry University] between 1975 and October 1980";

(c) maintain graduate-specific data to substantiate "any representations to any student, prospective student, accrediting agency, state agency, the Secretary, or member of the public that are based, in whole or in part, on graduate employment rates";

(d) "maintain information sufficient to establish the methodology it used to formulate any representations regarding post-graduation employment outcomes of [DeVry University] students"; and

(e) for six years, engage a qualified, independent third party to review the required records and information relating to DeVry University graduates, so that that independent third party may issue a report on an annual basis stating whether DeVry university has satisfied its responsibilities to maintain graduate-specific employment records and has maintained information sufficient to establish its methodology used to make representations about employment outcomes of DeVry University graduates.

233.    The DoE Settlement also requires DeVry to post the following statement for two years on the home page of DeVry University's website:

DeVry University previously advertised that "Since 1975, 90% of DeVry graduates system-wide in the active job market held positions in their

fields of study within 6 months of graduation."

The U.S. Department of Education has asserted that the records maintained by DeVry University for the period 1975-1983 were not sufficient to substantiate the Since 1975 Representation, and thus that DeVry University could not substantiate this representation to the extent required by law. Accordingly, the University agreed to cease making the Since 1975 Representation and post this notification on its website.

234.    Moreover, the DoE Settlement requires the same statement to be included for six years in all agreements memorializing the enrollment of students at DeVry University.

235.    The DoE Settlement further requires DeVry University to post a letter of credit for the benefit of the DoE in the amount of $68,435,908—approximately 10% of the Title IV aid revenue to DeVry University for the 2014-15 award year.  For a period of five years, DeVry will be required to maintain the letter of credit and adjust it annually to remain at a level equal to 10% of the Title IV aid revenue it received in the previous fiscal year. As explained in the DoE Settlement, that letter of credit is designed to allow the DoE to provide refunds to students in the event that DeVry University closes.

236.    On December 15, 2016, DeVry (through Defendants) and the FTC announced that DeVry and DeVry University had agreed to settle the FTC Action. According to the FTC's press release issued that day, the settlement requires DeVry to refund a total of $100 million to harmed students and graduates in the form of cash and debt relief, and "also includes provisions designed to prevent DeVry from misleading consumers in the future."  As stated by FTC Chairwoman Edith Ramirez in the press release, "[w]hen people are making important decisions about their education and their future, they should not be misled by deceptive employment and earnings claims. . . . The FTC has secured compensation for the many students who were harmed, and I am

pleased that DeVry is changing its practices."

237.    Under the terms of the FTC Settlement, DeVry will pay $49.4 million in cash to be distributed to qualifying students who were harmed by the deceptive ads that boasted inflated job placement rates and income levels upon graduation, as well as $50.6 million in debt relief.  The debt relief includes the full balance owed on all private unpaid student loans that DeVry provided to its undergraduate students between September 2008 and September 2015 (totaling $30.35 million), and $20.25 million in student debts for items including tuition, books, and certain course-related fees.

238.    The FTC Settlement also requires DeVry to discontinue its use of deceptive job placement rates and salary information moving forward and, for a period of ten years, to confirm that it is in compliance with imposed policy reforms.

239.    First, DeVry and any of its "officers, agents, employees, and attorneys and all other persons in active concert or participation with any of them" are "permanently restrained and enjoined from:"

- Misrepresenting, expressly or by implication, the success that students or graduates have realized or are likely to realize in starting or obtaining careers, jobs or employment.  This prohibition includes, but is not limited to, misrepresenting:

  - the extent to which – whether expressed by a number, a percentage or otherwise – graduates or any subset of graduates have obtained jobs or careers:

    - in their field of study;

    - in any specified field or type of employment;

- with any given category or type of employer;

- with any particular employer; or

- within a given time frame;

  o the extent to which any employment statistic, or any other statement that refers to the employment success or status of students or graduates, reflects the success of students or graduates who were actively seeking employment;

  o the extent to which any employment statistic, or any other statement that refers to the employment success or status of students or graduates, either includes or does not include any subset of students or graduates; or

  o that any individual obtained a job or career, in his or her field of study or otherwise, as a result of attending DeVry.

- Misrepresenting, expressly or by implication, the compensation or compensation range that students or graduates of DeVry have received, or can be expected to receive, including but not limited to, misrepresenting that the compensation of any group of students or graduates is or was (a) equal to or greater than a specific amount, average or median, or (b) equal to or greater than the compensation received by any other group of students or graduates;

- Misrepresenting, expressly or by implication, any other fact material to consumers concerning any such product or service;

- Making any representation, expressly or by implication:

  o that any employment statistic reflects the success of graduates in obtaining employment near or after graduation when the statistic includes

employment that graduates obtained (a) before purchasing the product or service, or (b) at any time more than six months prior to graduating; provided, however, that nothing in this [subsection] shall be construed to prohibit DeVry from making a representation to a state or federal authority or programmatic or institutional accreditor on a reporting form required by such entity, provided further that DeVry clearly and conspicuously disclose on such form, either as the primary number or in a footnote in 14-point font, the percentage of students who obtained their jobs upon or after graduating; or

o   that any employment statistic reflects the employment status or employment success of graduates who were actively seeking employment if graduates were classified as not actively seeking employment based on (a) having waived career-services assistance, in whole or in part, or (b) the extent to which the graduates used career services.

- Making any representation, expressly or by implication, about the benefit of any educational product or service, or the success or likely success of any student or graduate, unless the representation is non-misleading, and, at the time such representation is made, DeVry possesses and relies upon Competent and Reliable Evidence[3] that is sufficient to substantiate that the representation is true.

240.   Second, DeVry is required to "preserve all Competent and Reliable

---

[3] The FTC Settlement Stipulation and Order defines "Competent and Reliable Evidence" as "tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area that have been conducted and evaluated in an objective manner by qualified persons, using procedures generally accepted in the profession to yield accurate and reliable results."

Evidence relied upon to substantiate any representation" concerning, among other things, student outcomes for DeVry University graduates.   Thus, if DeVry makes such a representation that relates to any class of current or former students or graduates, DeVry must preserve, among other things: (i) all student files relating to the students or graduates; (ii) all communications relating to complaints received from any student or graduate concerning the person's job search experience, compensation or compensation range of jobs, assistance or lack of assistance from DeVry in attempting to find employment, or any advertising or marketing that referred to obtaining employment or to compensation received by past graduates; (iii) all forms completed that relate to a student's or graduate's employment status, job search or use of or attempted use of DeVry's career-related services; (iv) all documents and information relating to any student's or graduate's employment status or income at any point before or after graduation; (v) all documents relating to any audit, review, survey or analysis underlying or supporting any rate or statistic used in any representation . . . including the employment status or compensation of students or graduates; and (vi) all documents used by DeVry to determine any calculation, rate or statistic used in any representation, including how to classify the employment status of any student or graduate, and any factor utilized in determining the number of students or graduates placed in the numerator or the denominator of any such calculation, rate or statistic.

241.   Third, DeVry is also required to establish a "training program for all principals, officers, directors, managers, employees, agents, and representatives who direct or engage in the promotion or sale of any educational product or service."  This training program is to remain in place for 20 years and DeVry must "[e]nsure . . . that the

training program addresses the trainee's duty not to use or make any representation prohibited under [the Settlement Stipulation]."

242.    Fourth, one year after approval of the settlement, DeVry and DeVry University must submit a compliance report to the FTC describing, among other things, "whether and how that Defendant is in compliance with each Section of [the Settlement Stipulation] including, but not limited to, describing in detail the way that Defendant calculates, documents and substantiates any claim covered by [the Settlement Stipulation.]"  For 10 years, DeVry and DeVry University must submit a compliance notice to the FTC, within 60 days of any change in, among other things, "any process or procedure for calculating, documenting or substantiating any claim covered by [the Settlement Stipulation.]"

243.    Fifth, DeVry and DeVry University are required to create certain records for 15 years, including, among others, accounting records showing the revenues from all goods or services sold, certain personnel records, and records of all consumer complaints relating to advertisements, person's experience in attempting to obtain a job or employment, compensation or compensation range of jobs, DeVry's job placement rates or employment statistics, and any assistance the person received or failed to receive from DeVry in attempting to find employment. DeVry and DeVry University are also required to create and maintain "records necessary to demonstrate full compliance with each provision of [the Settlement Stipulation], including all submissions to the Commission[.]"

244.    Finally, to allow the FTC to monitor DeVry's compliance with the terms in the FTC Settlement Stipulation, within 30 days after a written request from the FTC, DeVry must submit additional compliance reports or other requested information, appear

for depositions, produce documents, or respond to any other discovery request by the FTC that is prescribed in the Federal Rules of Civil Procedure.  DeVry must also permit the FTC to interview any employee or other person affiliated with any DeVry entity who has agreed to be interviewed.  The FTC may also employ any "other lawful means, including posing . . . as consumers, suppliers, or other individuals or entities, to DeVry or any individual or entity affiliated with DeVry, without the necessity of identification or prior notice."

245.    Accordingly, as a result of Defendants' actions, the Company has suffered damages, including (but not limited to) being the subject of the FTC Action (and FTC Settlement), the DoE Action (and DoE Settlement), the Securities Action, suffering a severe loss of reputation and standing, and witnessing the decimation of its share price.

**D.    Confidential Witness Accounts in the Securities Action Confirm Plaintiff's Allegations**

246.    As alleged above, while Plaintiff and her counsel have conducted their own, independent investigation, the Securities Complaint filed in the Securities Action contained the accounts of numerous Confidential Witnesses ("CWs") allegedly describing how the Company gamed the misleading DeVry University graduate job placement and salary statistics.  In particular, as alleged in the Securities Complaint, the Company used a system of waivers and opt-outs to select only certain students for inclusion in the student outcomes statistics, and also counted certain students as being employed in their chosen field of study even though those students' jobs were unrelated to their studies.  It has been alleged that based on their experience working at the Company, certain CWs expressed doubts that the Company's advertised employment and salary statistics could be true.  It has been alleged that these CW statements thus

corroborate the allegations as made by the FTC and DoE (and those asserted herein), that DeVry University's job placement and higher income claims were false and misleading.

247.    The CWs in the Securities Complaint are identified as follows:

•    It has been alleged that "CW1" was an Admissions Advisor for DeVry University's online programs from August 2011 to November 2012 in Chicago, Illinois, who was responsible for recruiting students throughout the United States.

•    It has been alleged that "CW2" was a Regional Marketing Director of DeVry's Northeast region from September 2008 to August 2013, who was in charge of marketing efforts in that region, which included New York City.   It has been alleged that CW2 worked on physical advertisement campaigns as well as social media efforts.   He reported to the National Marketing Director.

•    It has been alleged that "CW3" was an Associate Director of Career Services at DeVry University's Fresno and Bakersfield, California Campuses from January 2013 to January 2014, who worked directly with graduates to assist them in job placement.   It has been alleged that CW3 was familiar with how many graduates obtained jobs as well as the types of jobs they obtained.   It has been alleged that CW3 was also familiar with the school's process for determining job placement rates and its policies that determined which students would be counted in those statistics.   It has been alleged that he reported to the individual that was the president of both DeVry University's Fresno and Bakersfield

campuses.

- It has been alleged that "CW4" was a National Admissions Advisor for DeVry University's online programs from 2007 to 2011 in Chicago, Illinois, who was responsible for speaking directly to prospective students and encouraging them to attend DeVry. It has been alleged that he reported to the Assistant Director of Admissions.

- It has been alleged that "CW5" was an online Graduate Career Advisor for DeVry's Keller School of Management from January 2011 to December 2012 based in Naperville, Illinois, who was responsible for making calls to graduates who were within six months of graduation in order to obtain and review their resumes and cover letters and provide feedback. It has been alleged that he also advised these graduates on how to look for a potential job and provided interview tips. It has been alleged that CW5 confirmed that he was expected to meet a job placement rate minimum of what he believed to be 90%. It has been alleged that he reported to a manager in Career Services for the online division.

- It has been alleged that "CW6" was an Associate Dean at DeVry University's College of Engineering and Information Services in Irving, Texas, from July 2009 to July 2015. It has been alleged that in July 2014, CW6's job title changed to Faculty Program Chair but his responsibilities remained the same. It has been alleged that when he was named Faculty Program Chair in 2014, he began reporting to the Assistant Dean of Academic Affairs.

- It has been alleged that "CW7" was the Campus Director and then President of DeVry University's Fresno and Bakersfield, California campuses from January 2009 to May 2016. It has been alleged that he last reported to the Northwest Group President and, prior to that, reported to the Group Vice President. It has been alleged that CW7 confirmed that DeVry had a written national policy that described the process and rules for which students were included in or excluded from DeVry University's job placement statistics.

248. It has been alleged that CW1 was an Admissions Advisor for DeVry University's online programs from August 2011 to November 2012 in Chicago, Illinois, and it has been alleged that he stated that he was highly suspicious of DeVry's 90% job placement rate. It has been alleged that CW1 recalled being instructed to tell prospective students that "they would have a job after six months," but he could not recall the specific language he was instructed to use. It has been alleged that CW1 doubted the accuracy of those job placement claims because he thought it was "impossible" that 90% of students would have jobs within six months. It has been alleged that CW1 eventually refused to make such claims to prospective students because he felt guilty about saying it, and also eventually declined to tell prospective students that they would earn more than graduates of other schools. It has been alleged that CW1 believed that the suspicious job placement and higher income claims were powerful statements in recruiting students.

249. It has been alleged that CW1 stated that DeVry recorded its Admissions Advisors' calls with prospective students, and that the Company would issue warnings and dock the pay of employees who did not provide "the exact rates and exact

percentages they would give us."   It has been alleged that CW1 recalled being reprimanded for failing to provide the required job placement and salary statistics to prospective students.   It has been alleged that CW1 believed that other Admissions Advisors also suspected that the job placement and salary statistics were misleading at best, but felt pressure to make the claims to protect their jobs.  Admissions Advisors also had quotas which they were required to meet if they wanted to keep their jobs, and were under significant pressure to enroll students.

250.   It has been alleged that CW2 was a Regional Marketing Director of DeVry's Northeast region from September 2008 to August 2013, who was in charge of marketing efforts in that area, which included New York City.   It has been alleged that CW2 worked on physical advertisement campaigns as well as social media efforts.  It has been alleged that CW2 recalled that DeVry provided him with information about a 90% job placement rate that the school wanted him and his colleagues to use in marketing efforts.   It has been alleged that he said that the specific language about job placement rates that he was required to use had been reviewed and approved by DeVry's legal and compliance department, and that the Company kept a repository of approved language for use by the marketing department.

251.   It has been alleged that CW2 said that he was aware that the advertised job placement rates "might not be 100 percent accurate" due to a "grey area" in whether graduates were obtaining jobs in their field of study or in other industries, and he suspected that graduates were employed in jobs that most people would not define as being in the graduates' field of study.   It has been alleged that CW2 asserted that he was "very close" to the Company's social media efforts, and it has been alleged that CW2

revealed that DeVry's job placement claims had come under online scrutiny "either by disgruntled students or the media," and that such scrutiny further led him to suspect that the Company's asserted job placement rates were not accurate.  It has been alleged that he said that the "whole marketing department" had similar concerns that the jobs used in the placement statistics were not in graduates' field of study.

252.    It has been alleged that CW2 explained that a typical student complaint on social media was to say that the 90% job placement rate was false, with statements such as "I haven't been able to find a job or anyone to hire" or "I've been working with career services, and I'm unable to get a job, [and] career service hasn't really helped me."  It has been alleged that CW2 stated that DeVry would actively monitor social media through its Social Media Team to stay apprised of what students were saying about their experience and ability to obtain jobs, which monitoring was an "important aspect" of the business.  It has been alleged that CW2 believed that the criticism of the 90% job placement claim was likely reported to Dave Pauldine, who was DeVry's Executive Vice President of Marketing and the President of DeVry University.  It has been alleged that Pauldine reported to Defendant Hamburger.

253.    It has been alleged that CW3 was an Associate Director of Career Services at DeVry University's Fresno and Bakersfield, California Campuses from January 2013 to January 2014 who worked directly with graduates to aid them in obtaining jobs.  It has been alleged that CW3 was familiar with how many graduates from his campus obtained jobs as well as the types of jobs they obtained.  It has been alleged that CW3 was also familiar with the school's process for determining job placement rates and its policies that determined which students would be counted in those statistics.  It has been alleged

that CW3 stated that DeVry only counted in its job placement statistics the graduates it defined as actively seeking jobs, and omitted graduates who DeVry had determined were "non-job seeking." Since the accrediting agencies of higher learning institutions did not have specific requirements for how schools calculated job placement statistics, DeVry had its own internal rules for which graduates were counted in those statistics and which were not. Furthermore, it has been alleged that CW3 added that each DeVry University campus had its own process for deciding if and when a graduate was "non-job seeking."

254.    It has been alleged that CW3 described how that process worked at his campuses. Following graduation from DeVry University, if the prospective graduates agreed to receive help from the career services department in finding a job, they would receive a "canned" email from the school each week their responsibilities in that job search effort. It has been alleged that these efforts would include writing and submitting a resume to the school, applying for jobs suggested by the school, communicating with school staff, and so on. If students did not perform these tasks or did not respond to emails or calls from the school, the career services advisors and directors could classify the student as "non-job seeking," which would waive the student from inclusion in job placement statistics.

255.    It has been alleged that CW3 stated that it could be weeks or even months before an unresponsive student would be labeled as non-job seeking, and that that determination was subjective. It has been alleged that his department often waited until nearly six months after graduation before waiving a student. It has been alleged that a final classification as non-job seeking required the approval of the campus president (as it has been alleged, CW7), who first reviewed each student's file showing the graduation

date and notes from the career services advisor about the student's job seeking efforts.

256.    It has been alleged that CW3 explained that DeVry graduates were often waived from inclusion in job placement statistics because they would become frustrated with burdensome requirements from the school's career services department.  It has been alleged that CW3 stated that the list of all responsibilities and requirements placed on graduates if they wanted to obtain help from the career services department in finding a job was extensive and meant that the career services department was "going to be up in their business."  It has been alleged that CW3 added that "they don't want that kind of attention, and after three weeks of phone calls and emails from us, they're like, 'Send me the form [to opt- out].'"  DeVry had a form specifically for students to sign indicating they wanted to opt-out of the career services job placement assistance.  It has been alleged that when students signed this form, they could be waived from inclusion in the job placement statistics, and it has been alleged that DeVry wanted its graduates to opt out so that they did not have to be counted in the job placement statistics.  It has been alleged that he believed the opt-outs and waivers were a "choice selection" by the school used for the purpose of boosting the appearance of its job placement statistics.  It has been alleged that CW3 said that at least five to six graduates of every 30-person cohort would typically opt out, in addition to approximately two who would be waived for being unresponsive.

257.    It has been alleged that CW3 stated that one of the reasons he left DeVry after one year was because he did not like how the school cared only about its placement numbers and statistics, and did not seem to sincerely care about finding jobs for students. It has been alleged that the other reason was due to the waivers.  It has been alleged that

the idea that the school could waive a graduate as non-job seeking because that graduate had not submitted a resume to the school or had not responded to some emails bothered him. It has been alleged that he said that it made his "skin crawl."

258.    It has been alleged that CW3 said that DeVry expected its career services department to meet a 95% to 100% job placement rate for graduates within six months of their graduation.  It has been alleged that CW3 noted that that rate was only possible due to the number of waivers that were obtained for students who were non-job seeking either voluntarily through opt-outs or as decided by the school.  "That's why DeVry was always at 95 percent placement," it has been alleged that he said.  "If they are not exhibiting job-seeking behavior, they were waived. That really disturbed me."  It has been alleged that without waivers, CW3 estimated that the true job placement rate at his campus was at most 60% to 70%.  It has been alleged that CW3 said he was fully aware of the actual job placement rate, and that everyone in career services and the campus president (as it has been alleged, CW7) were also aware.

259.    It has been alleged that CW3 provided reports to CW7 on a regular basis about the progress of job placement for graduates.  It has been alleged that each month he submitted information about each student, including details about who was placed in jobs and who was waived as non-job seeking.  "He would ask, 'What's the status? What's the situation?'" for each of the students he was working to place in jobs, it has been alleged CW3 said of CW7.  It has been alleged that according to CW3, CW7 reviewed the job status and situation of all graduates throughout the six months after graduation, and he personally spoke with him about the graduates.  It has been alleged that he believed CW7 fully understood the true percentage of job placement for the graduating cohorts.  "He

knew intimately everything that went on with every [graduate] file."

260.     It has been alleged that CW3 was also required to input all job placement information about each graduate into the school's career services database system called, "HireDeVry."  It has been alleged that he said that the information and documents input into the system included each graduate's graduation date, field of study, resume, job, income for that job, and any notes the career advisor took about the graduate's job search activities. It has been alleged that as described by CW3, if the graduate had been waived as nonjob seeking, that information was input into the system as well.  It has been alleged that he said that the HireDeVry system could be used to determine job placement percentages, but those percentages excluded all non-job seeking graduates who had been waived.  It has been alleged that CW3 said, however, that DeVry had another computer software system that could be used to determine job placement rates for all graduates including those who were otherwise waived from the school's official job placement claims.  It has been alleged that he said if he wanted to run a report showing the actual job placement rate, he would have to go into HireDeVry, save the dataset he wanted to use to run the numbers, then input that into the separate system and run the report.  Once the report was run, it has been alleged that he said, there was no way to save it in this separate system.  It has been alleged that he noted, however, that this system provided the school with the capability of running reports showing the actual job placement rate for graduates including students who had been waived in its official statistics.

261.     It has been alleged that CW3 also recalled DeVry's advertising campaign that claimed its graduates earned 15 percent higher incomes than graduates of other bachelor's degree programs.  It has been alleged that CW3 said that those claims were

"bogus" and "a lie."  It has been alleged that from his experience helping graduates find jobs, the jobs were almost always entry-level positions with salaries between $25,000 and $30,000.  It has been alleged that CW3 said that "there's no way there was any difference" between what DeVry graduates earned and what graduates from other schools earned in these same types of entry-level positions.  It has been alleged that he recalled that graduates would get angry with him when he explained what their job options would be and what they could expect to earn.  It has been alleged that CW3 said that many graduates believed they would be earning $40,000 due to marketing and other material they saw before enrolling.  It has been alleged that CW3 said a few highly paid graduates and graduates working in cities with higher wages could skew the averages higher, but that in most areas of the country, the wages remained low for new graduates.

262.   It has been alleged that CW4, (alleged to be a National Admissions Advisor for DeVry University's online programs from 2007 to 2011 in Chicago, Illinois) confirmed that DeVry supplied him with statistics about its students as well as other marketing material that he was expected to use when recruiting students.  It has been alleged that CW4 stated that advisors were encouraged to use the claim that 90% of DeVry University's graduates are employed in their field of study within six months of graduation. It has been alleged that CW4 stated that the encouragement to use the claim "came down from the top," noting that "[o]ur managers told us, but their managers told them." It has been alleged that according to CW4, he reported to a recruiting manager who, in turn, reported to the recruiting director.  It has been alleged that CW4 stated that DeVry's Career Services department was responsible for determining the job placement rate.  It has been alleged that he indicated that he and other admissions advisors were

aware that the 90% job placement claim did not include all students, but they were not required, nor expected to inform prospective students of that fact.  It has been alleged that CW4 believed that DeVry University's job placement rates only included first-time enrolled students and did not include students that transferred in or did not finish the program.

263.    It has been alleged that CW5, an online Graduate Career Advisor for DeVry's Keller School of Management from January 2011 to December 2012 based in Naperville, Illinois, stated that he did not keep track of his placement rates because it was done automatically by the Company's computer system, HireDeVry.  It has been alleged that CW5 explained that he did not run reports about job placement rates on his own, but recalled waiving a significant number of graduates for various reasons based on DeVry's policies.  It has been alleged that CW5 understood that these waived graduates were not counted in job placement statistics.  For example, it has been alleged that CW5 estimated that roughly 15% of graduates he dealt with were waived because they advised him that they were not seeking employment and that another 25% were waived because they already had jobs prior to graduation and were not seeking new employment.

264.    It has been alleged that CW6 was an Associate Dean at DeVry University's College of Engineering and Information Services in Irving, Texas, from July 2009 to July 2015.  It has been alleged that in July 2014, CW6's job title changed to Faculty Program Chair but his responsibilities remained the same.  It has been alleged that CW6 stated that campus-specific job placement rates of DeVry University graduates were reported up the chain of command within the Company.  It has been alleged that CW6 added that DeVry's corporate policy prohibited employees from releasing campus-

specific job placement rates to the public.

265.    It has been alleged that CW7 was Campus Director and then President of DeVry University's Fresno and Bakersfield, California campuses from January 2009 to May 2016, and it has been alleged that he said that DeVry had a written national policy that described the process and rules for which students were included or excluded in the job placement statistics of DeVry University graduates.  It has been alleged that CW7 confirmed that certain students were waived from inclusion in those statistics, and as Campus Director and them Campus President, he signed off on those waivers.  It has been alleged that he said that the waiver decisions and graduates' files were also occasionally reviewed for accuracy by higher-level employees.  It has been alleged that CW7 separately explained that DeVry kept records on how many graduates were not counted in the job placement statistics, and that that data was kept in the HireDeVry computer system.

266.    Accordingly, the confidential accounts in the Securities Complaint bolster the reasonable inference that the Company (under Defendants' direction and on their watch) used a system of waivers and opt-outs to select only certain students for inclusion in the student outcomes statistics, and also counted certain students as being employed in their chosen field of study even though those students' jobs were unrelated to their studies.  As a result, the Company's Relevant Period financial statements were false and misleading when made.

## DERIVATIVE AND DEMAND ALLEGATIONS

267.    Plaintiff brings this action derivatively in the right and for the benefit of DeVry to redress the breaches of fiduciary duty and other violations of law by

Defendants.

268.     Plaintiff will adequately and fairly represent the interests of DeVry and its shareholders in enforcing and prosecuting its rights.

269.     The Board currently consists of the following ten (10) directors: defendants Begley, Hart, Logan, Ruiz, Taylor, Wardell, and White, and non-defendants Michael W. Malafronte ("Malafronte"), William Burke ("Burke") and Kathy Boden Holland ("Holland").  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the reasons that follow.

270.     Defendants Begley, Logan, Ruiz, Taylor, Wardell, and White (a majority of the Board) served as directors of the Company during some or all of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.   The statements and advertising regarding DeVry University's alleged post-graduation rate of employment (as well as the other statements detailed herein) that defendants Begley, Logan, Ruiz, Taylor, Wardell, and White caused or allowed to be made repeatedly over a number of years were an integral aspect of the Company's core operations.  It was through these false advertisements and statements that the Defendants were able to illicitly entice unsuspecting individuals to enroll in the Company's programs, and the Company's financial results were thus directly related to these statements.   It was these very advertisements and statements that defendants Begley, Logan, Ruiz, Taylor, Wardell, and White caused or allowed the Company to make that subjected DeVry to the FTC Action and other investigations (including that of the DoE).  This was in violation of (among other things) these Defendants' fiduciary

duties of good faith and loyalty, as well as the Code.  Thus, defendants Begley, Logan, Ruiz, Taylor, Wardell, and White (a majority of the Board) each faces a substantial likelihood of liability for their acts in connection with these statements, rendering a demand upon them futile.

271.   The Board's challenged misconduct at the heart of this case constitutes unlawful/illicit activity or the facilitation of illegal/illicit activity.  In essence, as the "ultimate decision-making body" of the Company, the Board affirmatively adopted, implemented, and/or condoned a business strategy based on violations of law and/or a federal statute.  Breaking the law and/or violating a federal statute is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Significantly, a majority (six out of ten) of the current Board members (Wardell, Logan, Ruiz, Taylor, Begley, and White) have served as directors during the period of time in which the illicit scheme was in full effect (and before the FTC commenced the FTC Action).  A majority of the Board was or should have been alerted to the illegal and/or illicit activity, which these Board members likewise participated in (thereby subjecting the Company to even more damages).

272.   Simply put, violating the law and/or a federal statute, approving the violations of applicable law and/or statutes by others, or looking the other way while refusing to prevent others under the Board's control from violating the law and/or statutes are all forms of misconduct that cannot under any circumstance be examples of legitimate business conduct.  Because condoning a business strategy predicated on breaking the law and/or violating a federal statute cannot be a valid exercise of business judgement, demand upon the Board is excused.

273.    The principal professional occupation of defendant Taylor was his employment with DeVry as its President, CEO and COO, pursuant to which he received substantial monetary compensation and other benefits.  Further, defendant Taylor serves as a Senior Advisor to DeVry, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  In addition, according to the Company's Proxy Statement filed with the SEC on Form DEF 14A on October 2, 2016 (the "2016 Proxy"), Defendants have admitted that defendant Taylor is not independent.  Thus, defendant Taylor lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

274.    The principal professional occupation of defendant Wardell is her employment with DeVry as its President and CEO, pursuant to which she receives and will continue to receive substantial monetary compensation and other benefits.  In addition, according to the 2016 Proxy, Defendants have admitted that defendant Wardell is not independent.  Thus, defendant Wardell lacks independence from demonstrably interested directors, rendering her incapable of impartially considering a demand to commence and vigorously prosecute this action.

275.    During the Relevant Period, defendants Logan, Ruiz, Wardell, and White served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports, reviewing the integrity of the Company's internal controls, and ensuring that the Company was in compliance with legal and regulatory requirements (and the Code).  Defendants Logan,

Ruiz, Wardell, and White breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures, caused the above-discussed internal control failures, and caused or allowed the illicit activity described herein (which ultimately led the Company to become the subject of the FTC action).   Upon information and belief, the Audit Committee met at least quarterly during the period in question.   Therefore, the Audit Committee likely met at least twenty times during the period of wrongdoing alleged herein.   In any event, it is readily apparent that the Audit Committee Defendants undoubtedly met multiple times during the misconduct alleged herein.   Therefore, defendants Logan, Ruiz, Wardell, and White face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

276.   During the Relevant Period, defendants Taylor, Wardell, and White served as members of the Quality Committee.   Pursuant to the Quality Committee Charter, the members of the Quality Committee were and are responsible for, *inter alia*, providing oversight of risks and exposures related to academic quality, including accreditation, student persistence and outcomes.   Defendants Taylor, Wardell, and White breached their fiduciary duties of due care, loyalty, and good faith, because the Quality Committee, *inter alia*, caused, allowed or permitted the Company to make false statements and assertions regarding student outcomes (*i.e.*, the false statements regarding student employment rates detailed herein).   Therefore, defendants Taylor, Wardell, and White face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

277.    Defendants Begley, Logan, Ruiz, Taylor, Wardell, and White (a majority of the Board) each signed one or more of the false and misleading Forms 10-K and/or Forms 10-Q described herein.   These SEC filings signed and authorized by these Defendants were false and misleading because they falsely stated and/or failed to disclose that: (1) the "actual percentage of [DeVry University] graduates who, at or near the time they graduated, found jobs that could be reasonably considered 'in their field' is significantly smaller than 90%"; (2) Defendants included in the false job placement statistics graduates who did not obtain employment as a result of acquiring a DeVry University degree, excluded graduates who were actively seeking employment, and misleadingly counted graduates who were employed but not in their field of study; (3) DeVry University's job placement claims were only made possible by the use of waivers and opt-outs from its career services department; (4) due to the high burdens placed on students in order to be treated as job-seeking for purposes of inclusion in employment statistics, the waivers and opt-outs acted as a means to choice-select students for the purpose of boosting the appearance of DeVry University's job placement statistics; (5) Defendants were unable to substantiate the truthfulness of its statement that "[s]ince 1975, 90.1% of DeVry graduates system-wide in the active job market held positions in their fields of study within 6 months of graduation"; (6) a third-party study that Defendants relied upon for their higher-income claims used a dubious survey methodology and sampling methods; (7) DeVry University's own data contradicted Defendants' claims that DeVry University's bachelor's degree graduates earn 15% more than graduates from other schools; and (8) DeVry University graduates' jobs were almost always entry-level positions with salaries between $25,000 and $30,000.   As a result,

defendants Begley, Logan, Ruiz, Taylor, Wardell, and White (a majority of the Board) each face a substantial likelihood of liability for their actions described herein, rendering any demand upon them futile.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

278.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

279.    As alleged herein, each of the Defendants had a fiduciary duty to, among other things, ensure that the Company and its subsidiaries (including DVU) were operated in a lawful manner, and to exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems being experienced with the Company's and/or its subsidiaries' business practices and operations, should have exercised good faith in taking appropriate action to correct the misconduct and to prevent its recurrence.

280.    The Defendants willfully ignored the obvious and pervasive problems being experienced with DeVry's internal controls practices and procedures, and failed to make a good faith effort to correct these problems or prevent their recurrence, which ultimately led to the Company becoming the subject of the FTC Action and the action by the DoE.

281.    Additionally, as alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that DeVry disseminated accurate, truthful and complete information to its shareholders.

282.    The Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to DeVry shareholders

materially misleading and inaccurate information through, *inter alia*, DeVry's SEC filings and other public statements and disclosures as detailed herein, which failed to disclose that the Company was being operated in an unlawful and/or illicit manner. These actions could not have been a good faith exercise of prudent business judgment.

283.    The Defendants' misconduct alleged herein further constituted an abuse of their ability to control and influence DeVry and its subsidiaries, for which they are legally responsible.  In particular, the Defendants abused their positions of authority by causing or allowing DeVry and its subsidiaries to misrepresent material facts regarding its post-graduate employment data, business practices, financial position and business prospects.

284.    Defendants had a duty to DeVry and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of DeVry and its subsidiaries (including DVU).

285.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of DeVry and its subsidiaries in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of DeVry's affairs, and in the use and preservation of DeVry's assets.

286.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Defendants caused DeVry and/or its subsidiaries to engage in the illicit scheme complained of herein which they knew had an unreasonable risk of damage to DeVry,

thus breaching their duties to the Company.   As a result, the Defendants grossly mismanaged DeVry.

287.   As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

288.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

289.   Plaintiff, on behalf of DeVry, has no adequate remedy at law.

## COUNT II
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

290.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

291.   By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of DeVry in the form of, *inter alia¸* salaries, bonuses, stock options, and/or other forms of executive compensation.

292.   Plaintiff, as a shareholder and representative of DeVry, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT III
## AGAINST ALL DEFNDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

293.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

294.   Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the

time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, both the 2014 Proxy and the 2015 Proxy (collectively, the "Proxies") violated §14(a) and Rule 14a-9 because it solicited DeVry shareholder votes for, *inter alia*, director reelection and executive compensation, while simultaneously misrepresenting and/or failing to disclose the Company's false job placement statistics that had been continuously touted and repeated by Defendants.

295.   As alleged herein, in the Proxies, Defendants specifically referenced the Code, which required the compliance with all laws, rules, and regulations. Because the Company, under Defendants' direction and on their watch, was affirmatively engaging in illicit activity in violation of laws and/or regulations, Defendants affirmatively violated the Code. Not only did the Proxies not disclose these illicit activities, but they likewise did not disclose that the express terms of the Code were being violated.

296.   In addition to requiring compliance with all laws, rules, and regulations, the Governance Principles specifically required Defendants to, *inter alia*, assess major risks facing DeVry Group and reviewing options for their mitigation and/or elimination.

297.   Despite these requirements, the Proxies not only failed to disclose the "major risks" facing the Company regarding the false job placement statistics, but also Defendants' failure to adequately review and assess them. In fact, as discussed above, rather than reviewing or assessing the risks posed by the false job placement statistics when they first knew as required by the Governance Principles, Defendants instead continued to issue a series of false and misleading statements. Further, Defendants failed

to disclose in the Proxies that as a result of the false job placement statistics and the numerous false and misleading statements concerning it, Defendants were violating the Governance Principles on this basis alone.

298.    Finally, in the Proxies, Defendants repeatedly falsely touted that the proposed executive compensation packages (which were voted on by the Company's shareholders) were based on a so-called "pay-for-academic performance focus."   For instance, in the 2015 Proxy, Defendants caused the Company to state that "since the ongoing achievement of our students is essential to the creation of long-term shareholder value, beginning in August 2012 we decided to tie our Performance Shares to a combination of measures of student achievement for each of our core educational institutions."

299.    Further, in the 2015 Proxy, Defendants cited "Student Retention" at Carrington College (one of the Company's "core educational institutions") as one of the "pay-for-academic performance" metrics, which was used to partly justify the executive compensation awarded (and voted on by the Company's shareholders)  In explaining the use of "Student Retention" as a performance metric, Defendants touted that "it is perceived to be one of the best measures of the success of Carrington College's students in its programs, and *a strong indicator of students' ability to secure employment* and be able to pay back their student loans."

300.    Defendants' statements in the Proxies, which touted a purported "pay-for-academic" performance philosophy and specifically highlighted a performance metric that was purportedly "a strong indicator of students' ability to secure employment" were false and misleading because they failed to disclose that the Company's job placement

statistics (and any compensation awarded based on them) were false all along.

301.    In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxies were materially false and misleading.

302.    The misrepresentations and omissions in the Proxies were material.  The Proxies were essential links in the accomplishment of the continuation of Defendants' scheme by which they claim to adhere to, *inter alia*, the express terms of the Code and Governance Principles.

303.    In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxies were materially false and misleading, and/or that the Proxies omitted material information.  The Company was damaged as a result of Defendants' material misrepresentations and omissions in the Proxies.

<b>PRAYER FOR RELIEF</b>

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing DeVry to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to

strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to DeVry restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 18, 2017

Respectfully submitted,

*/s Matthew T. Hurst*

Heffner Hurst
Matthew T. Hurst
Matthew T. Heffner
30 North LaSalle Street, 12th Floor
Chicago, Illinois 60602
Phone: (312) 346-3466
Fax: (312) 346-2829
Email: mhurst@heffnerhurst.com

*Liaison Counsel*

**Profy Promisloff & Ciarlanto, P.C.**
Jeffrey J. Ciarlanto
Joseph M. Profy
David M. Promisloff
100 N 22nd Street, Unit 105
Philadelphia, PA 19103
Phone: (215) 259-5156
Fax: (215) 600-2642

**Law Office of Alfred G. Yates, Jr., P.C.**
Alfred G. Yates, Jr.
Gerald L. Rutledge
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033

*Counsel for Plaintiff*